## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN CENSOR, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:11-cv-00597 (VLB) |
| ASC TECHNOLOGIES OF CONNECTICUT, | : | |
| LLC, LILLIAN SHAPIRO, THOMAS CECONI, | : | |
| HR 360, INC., JOHN DOES and JANE DOES, | : | |
| Defendants. | : | September 28, 2012 |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [Dkts. 83, 84]; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR AN ACCOUNTING [Dkt. 79]; AND DENYING DEFENDANTS' MOTION TO AMEND [Dkt. 81]

### I.      Introduction

Plaintiff Martin Censor ("Censor"), an attorney specializing in human resources and employment law, brings this suit against ASC Technologies of CT, LLC ("ASC"), agents of ASC Thomas Ceconi ("Ceconi") and Lillian Shapiro ("Shapiro"), and HR 360, Inc. ("HR 360"). Censor brings claims against the Defendants stemming from his contractual relationship with ASC governing the inception and operation of the website Benefits Essentials, including claims for breach of contract, breach of fiduciary duty and fraud under Connecticut law, and copyright infringement in violation of the Federal Copyright Act of 1976, 17 U.S.C. § 101, et. seq. Currently pending before the Court are (1) Plaintiff's Motion for Partial Summary Judgment Directing an Accounting, (2) Defendant ASC's Motion for Summary Judgment, (3) Defendants Shapiro's, Ceconi's and HR 360's Motion

1

for Summary Judgment, and (4) Defendants' Motion to Amend their Answer and

file additional counterclaims.

## II.   <u>Factual Background</u>

As an initial matter, the Court notes that Fed. R. Civ. P. 56(c)(1) requires

that

> [a] party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by (A) citing to
> particular parts of materials in the record, including
> depositions, documents, electronically stored
> information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only),
> admissions, interrogatory answers, or other materials;
> or (B) showing that the materials cited do not establish
> the absence or presence of a genuine dispute, or that an
> adverse party cannot produce admissible evidence to
> support that fact.

Rules 56(c)(2) and (c)(3) declare that a "party may object that the material cited to

support or dispute a fact cannot be presented in a form that would be admissible

in evidence" and that "[t]he court need consider only the cited materials, but it

may consider other materials in the record." Additionally, "[i]f a party fails to

properly support an assertion of fact or fails to properly address another party's

assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion . . . [or] grant summary judgment if the

motion and supporting materials – including the facts considered disputed –

show that the movant is entitled to it . . ." Fed. R. Civ. P. 56(e)(2), (e)(3).

Further, Local Rules of this district impose several specific requirements

on the parties when arguing a summary judgment motion. Local Rule 56 requires

that a party filing a summary judgment motion annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). "All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party. . ." *Id.* Local Rule 56(a)(2) requires that the papers opposing a motion for summary judgment shall include a document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried." Each statement of material fact in a Local Rule 56(a)(1) or Local Rule 56(a)(2) statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)(2) statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)(3).

In the present case, Defendants have submitted Local Rule 56(a)(1) statements in support of their Motions for Summary Judgment, along with Declarations in support thereof by Lillian Shapiro and Defendants' attorney Michael Cicero. [*See* Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements; Dkt. 83-3, Shapiro Decl.; Dkt. 83-4, Cicero Decl.] Plaintiff, however, has failed to include a 56(a)(2) statement  with his Memorandum in Opposition to Defendants' Motions for Summary Judgment.  Plaintiff has, though, submitted a Declaration in support of his Opposition to Defendants' Motion for Summary Judgment. [Dkt. 89-1, Censor Decl.] Additionally, Plaintiff has filed a defective 56(a)(1) statement in support of

his Motion for Partial Summary Judgment, in that the statement neither lists the material facts to which there is no genuine issue to be tried, nor cites to affidavits or evidence admissible at trial. Censor has also submitted an unsworn "Declaration" signed by his attorney who appears to have no personal knowledge of the facts to which he purportedly avers. In support of his Motion for Partial Summary Judgment Directing an Accounting, the Plaintiff submitted a signed and notarized affidavit. Defendants submitted a 56(a)(2) statement responding to Plaintiff's purported 56(a)(1) statement. Thus, although Plaintiff broadly fails to cite to "particular parts of materials in the record" under Fed. R. Civ. P. 56(c)(1) in his opposition to Defendants' motions and in his own Motion for Partial Summary Judgment, he has presented an affidavit and his attorney's declaration of unsupported factual and legal assertions in support of his positions. The Court therefore will consider Censor's declaration and the admissible evidence attached to it, as well as Censor's affidavit supporting his Motion for Partial Summary Judgment and the admissible evidence attached thereto. The Court will also consider Defendants' appropriately submitted 56(a)(1) Statements and the evidence in support thereof. Where Censor, in his declaration opposing summary judgment, either admits or does not oppose or object to the facts contained in those documents the Court will accept them as true. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

4

The Court also notes that notwithstanding Plaintiff's defective or nonexistent Local Rule 56 statements, Plaintiff claims he filed this action by way of verified complaint. "[A] party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." *Fitzgerald v. Henderson*, 251 F. 3d 345, 360-61 (2d Cir. 2001). Verification of a complaint by the plaintiff is the equivalent of the oath that would be given with respect to an affidavit submitted in opposition to a motion for summary judgment under Fed. R. Civ. P. 56(c)(1)(A). *See id.* at 361 (reliance on a verified complaint is proper in support of an opposition to summary judgment); *Dzugas-Smith v. Southold Union Free School Dist.*, 2012 WL 1655540, at *15 (E.D.N.Y. May 9, 2012) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves .. . unless the pleadings are verified in a manner equivalent of the oath that would be given with respect to an affidavit*") (internal quotation marks and citations omitted). The complaint – while it does contain a signed certification that the matters contained therein are true to Plaintiff's own knowledge – is neither notarized nor sworn under penalty of perjury. Thus, Plaintiff may not rely on this unverified complaint in opposing Defendants' properly supported motions for summary judgment.

It is undisputed that on April 11, 2003, Plaintiff Martin Censor and Defendant ASC entered into a contract governing the parties' relationship in

running a subscription website business called Benefits Essentials. [Dkts. 83-2 &
84-2, Ds' 56(a)(1) Statements at ¶¶ 1-2]  The terms of the agreement - entitled the
"Joint Venture Agreement" (the "Agreement") - are likewise not in dispute.[1]
Article II of the Agreement sets forth the "Obligations of the Joint Venturers" as
follows:

> All parties share equally in the operations and decisions
> of the Joint Venture. The parties agree to a split of
> duties between themselves as follows:
>
> Martin Censor is primarily responsible for updating the
> content.
>
> ASC is primarily responsible for marketing and
> technology (i.e., site development and maintenance).
> ASC will host the site on its servers and/or at its
> expense.

[Dkt. 79-1, Censor Aff. at Exh. C, Article II; Dkt. 83-3, Shapiro Dec. at Exh. 1,
Article II]  Article III of the Agreement, "Allocations," states as to profits and
losses that

> Commencing on the date hereof and ending on the
> termination of the business of the Joint Venture, all
> profits, losses and other allocations to the Joint Venture
> shall be allocated quarterly, as follows: Fifty percent

---

[1] ASC has denied, however, that the Joint Venture Agreement attached by Censor
as Exhibit A to the Complaint is a true and accurate copy of the Joint Venture
Agreement. The agreement provided by Censor contains a clause providing that
New York law shall govern. ASC claims that the final version of the Joint Venture
Agreement provides that Connecticut law shall govern. On December 29, 2011,
the Court cancelled a scheduled evidentiary hearing to determine whether the
agreement proffered by Censor was a forgery, in light of Censor's concession to
the applicability of Connecticut law. The Court has accepted the parties'
concession that the Joint Venture Agreement "shall be construed and enforced
under the laws of the State of Connecticut" as per the Agreement's Applicable
Law clause. [Dkt. 1, Compl. at Exh. A, Article VII; Dkt. 36-1, Article VII]

(50%) to ASC and fifty percent (50%) to Censor. In the
event of the sale of the partnership, Censor will receive
50% of the sale price and ASC will receive 50% of the
sale price.

[Dkt. 79-1, Censor Aff. at Exh. C, Article III; Dkt. 83-3, Shapiro Dec. at Exh. 1,

Article III]  The Agreement also addresses copyright issues, in that

[t]he parties stipulate that Censor is the sole owner of
the copyright to the site content; Censor shall retain
such rights during the life of this venture and in the
event of termination of dissoluation of the venture.

[Dkt. 79-1, Censor Aff. at Exh. C, Article IV; Dkt. 83-3, Shapiro Dec. at Exh. 1,

Article IV]  The Agreement entitles the parties to dissolve their relationship

pursuant to the following provision:

The Joint Venture shall be dissolved upon the
happening of any of the following events: (a) The
adjudication of bankruptcy, filing of a petition pursuant
to a Chapter of the Federal Bankruptcy Act, withdrawal,
removal or insolvency of either of the parties. (b) The
sale or other disposition, not including an exchange of
all, or substantially all, of the Joint Venture assets. (c)
Mutual agreement of the parties. Upon dissolution, other
than the sale of the partnership including the
partnership property (BenefitsEssentials), the parties
agree that the content of BenefitsEssentials shall remain
the property of Censor.

[Dkt. 79-1, Censor Aff. at Exh. C, Article VI; Dkt. 83-3, Shapiro Dec. at Exh. 1,

Article VI]  Lastly, the Agreement provides the method in which it may be

amended by the parties:

[t]he parties hereto covenant and agree that they will
execute each such other and further instruments and
documents as are or may become reasonably necessary

7

or convenient to effectuate and carry out the purposes
of this Agreement.

[Dkt. 79-1, Censor Aff. at Exh. C, Article VII; Dkt. 83-3, Shapiro Dec. at Exh. 1,

Article VII]

The parties do not dispute that Censor and ASC exercised differing

responsibilities in the creation, maintenance and growth of Benefits Essentials.

ASC maintained control over the subscription business while Censor took on

content-related and editorial responsibilities.  [Dkts. 83-2 & 84-2, Ds' 56(a)(1)

Statements at ¶¶ 2, 4]  ASC took an administrative and technological role; ASC

owned the domain name for the website, hosted the website on its servers,

maintained the website, and provided office space for the operations of the

website [Dkt. 83-3, Shapiro Dec. at ¶ 11]. ASC also marketed subscriptions to the

website and collected all subscription fees, managed all client issues and

customer support, and "over[saw] all non-editorial staff and some editorial staff."

[Dkt. 83-3, Shapiro Dec. at ¶ 11]. Censor, on the other hand, edited and updated

the website's content and corresponded directly with customers through a link

on the website from which customers could pose questions and offer feedback

and corrections [Dkt. 83-4 Exh. 5, Censor Depo. at 56, 63], marketed the website

by contacting potential subscribers, entered Benefits Essentials into various

contests for best website, maintained contact with large subscribers (who Censor

contends he originally brought to the joint venture), prepared webinars for

dissemination on the website, answered "Ask-the-Experts" questions posed by

subscribers, developed and maintained a monthly newsletter and blog, and

prepared press releases. [Dkt. 89-1, Censor Dec. at ¶ 4] Benefits Essentials was

itself a product and not a separate business entity; it had no bank accounts and no Employer Identification Number on file with the IRS, and Benefits Essentials itself did not grant any licenses for use of the website. [Dkt. 83-3, Shapiro Dec. at ¶ 10]

Although the Agreement called for an equal split of the profits from Benefits Essentials, the parties revised this breakdown – evidenced by an email exchange between Censor and Shapiro on December 23, 2008 – to reduce Censor's percentage of profits. [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 10] In this email exchange, the subject of which was "summary of our deal," Shapiro wrote:

> I feel confident we can all make this work. To summarize, Tom [Ceconi] and I will get an additional 15% from existing sales and 15% from new sales commissions. I will prepare a commission report monthly. You will get a minimum of $6,000 a month from the business or we will recalculate our increased percentage to make this work for your needs. If any issues arise about making this work, I will call to discuss but I hope and pray we can meet these obligations successfully. I feel very energized and filled with hope for the future.[2]

[Dkt. 83-3, Shapiro Decl. at Exhibit 3; *see also* Dkt. 1, Comp. at Exh. B]

Twelve minutes later, Censor replied:

---

[2] Censor claims that per this email his share was reduced from 50% to 35%, and that Shapiro and Ceconi "were taking an additional 15%." [Dkt. 1, Comp. at ¶ 24(a)] Defendants contend that the split of profits changed from 50/50 to 80/20, with twenty per cent to Censor and eighty per cent to ASC. [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 10] Defendants assert that, after December 23, 2008, payments from ASC to Censor reflected Censor's 20% share. [*Id.* at ¶ 11].

> OK. But (there's always a "but")…
>
> Can we please agree to cut out (or cut down on) any "outside" expenses during the next two months' trial period. By that I mean no new editorial projects or new technology. Of course, whatever is required for "maintenance" or ongoing projects should continue. In this way, we can truly focus on the product, and gauge if this new arrangement is working out.

[*Id.*]  On January 2, 2009, Shapiro responded: "will do--maintenance as you mentioned is necessary to make sure everything stays working and accurate." [*Id.*]

Censor and Shapiro again corresponded by email about the split of profits four months later. On May 2, 2010 Censor questioned Shapiro: "Any money in the till? I'm not sure any more what the split is these days but I cannot afford to give up my share. I have a mortgage and tuitions to pay." [Dkt. 83-3, Shapiro Decl. ¶ 18, Exhibit 4; *see also* Dkt. 1, Comp. at Exh. C] Two days later, Shapiro responded:

> This month's check will have an extra $1,500 due to the quarterly payment from [a client].
>
> At this time, HR & Benefits Essentials site requires full-time management of content. No longer can this job be done part-time. The attached content management policy which you wrote years ago is a good guideline which we are following. To get the job done, we have a full-time editor at $50,000 a year plus benefits, a part-timer who does link checking and review of all the links on ours [sic] site. The site has thousands of links that break/change regularly and have to be maintained. We also average payment to Ken of about $1,000 a month for ask the experts questions.

> If you want to come and work in Stamford for 9+ hours a day for about $6,000 a month, we can consider terminating Tim and Kim but all that work would fall to you and it must be done in a timely basis, all day, every day.

[*Id.*]

ASC contends and Censor does not dispute that by late 2010 it was no longer able to continue its business relationship with Censor "because the quantity and quality of Censor's editorial work had declined significantly, and because Censor had, despite repeated requests, refused to provide evidence that he held copyright assignments to materials of third parties that had appeared on the Benefits Essentials Website." [Dkt. 83-3, Shapiro Decl. at ¶19] By letter from defendant Ceconi – ASC's President – to Censor dated December 10, 2010, ASC withdrew from the Agreement effective December 17, 2010.  [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 9; *see also* Dkt. 89, P's Opposition to Ds' MSJ, at p. 5 and Exh. B] The letter, in relevant part, reads:

> We now understand that the mediation will cost us a substantial sum in attorneys' fees, as well as any litigation if we are unsuccessful in finding a resolution. Therefore, after considerable thought, ASC Technologies of CT, LLC is terminating the joint venture with you as of 5:00 pm EST on December 17, 2010, and we wish to commence the process of winding up.

> Pursuant to Article VI of the Joint Venture Agreement dated April 11, 2003 we are in the process of gathering the HTML files for transmission to you.

> We would like now to turn our discussion with you to complete the winding up of the joint venture. Among

>other things, of course, we will want to execute appropriate releases for our mutual benefit.

>We suggest beginning those discussions no later than early next week . . .

>This obviates the need for mediation and it is being cancelled.

On December 22, 2010 Ceconi sent Censor a letter regarding the winding up of the relationship, reading in relevant part:

>I am sure you are aware, in the absence of specific limitations, joint ventures are terminable at will. With regards to the legal issues you raised, it is our position that we have the absolute right to withdraw from the joint venture. . .

>Connecticut law is clear that a joint venturer can withdraw from a joint venture, absent specific limitations, at any time. Here is how we propose to wind up the joint venture:

>1. Content. Under the Joint Venture Agreement, you are entitled to all of the content of Benefits Essentials upon dissolution. Enclosed, we have placed all content in HTML format on a CD.

>2. Accounting. We are in the process of completing all accounting for calendar 2010 and it is expected to be complete on or about January 15th.

>3. Clients. We are prepared to provide you a list of all subscribers served by Benefits Essentials. However, these clients have entered into a licensing agreement with ASC pursuant to which ASC is obligated to keep all information related to their subscription confidential. Consequently, delivering this list to you is conditioned upon your agreement to the terms of a confidentiality agreement.

**4. Continued Operation While Winding Up. We cannot, of course, simply turn off the switch to the website and leave clients out in the cold. We also need to work out the financial elements of this transaction. Therefore, ASC is willing to host the website benefitsessentials.com for the next 45 days at no cost to you. With regard to revenues received during that period, they will be addressed in the forthcoming accounting and are subject to negotiation.**

**5. Finally, after the above has been competed [sic], we can attempt to determine an arrangement which is fair and equitable.**

**[Dkt. 79-1, Censor Aff., at ¶ 4 and Exh. C]**

**ASC provided Censor with a compact disk containing the content of the Benefits Essentials website in December, 2010.[3] [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 13; Dkt. 83-4 Exh. 5, Censor Deposition at 74] The disk contained content authored by Censor, by ASC, by government sources, and by other third parties. [Dkt. 83-3, Shapiro Decl. at ¶26] Defendants contend that ASC was in the process of preparing the updated accounting contemplated in Ceconi's December 22, 2010 letter when Censor filed suit.  [Dkt. 83-3, Shapiro Dec. at ¶ 27] Censor contends that the requisite accounting has not occurred. [Dkt. 79-1, Censor Aff., at ¶ 10]**

**Shapiro and Ceconi formed HR 360 on December 9, 2010.  [Dkt. 83-3, Shapiro Decl. at ¶ 21; dkt. 36, Answer at ¶¶ 26, 28] As of 2012 the HR 360 website**

---

**[3] According to Ceconi's December 22, 2010 letter to Censor, this disk was included with the letter. However, Censor stated during deposition that he registered copyright to Benefits Essentials on December 20, 2010, using the disk provided by Ceconi. [Dkt. 83-4 Exh. 5, Censor Depo. at 17] The record is unclear as to when Censor obtained this disk or whether he used it to obtain the copyright.**

contained more than 4,500 pages of content. [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 19; Dkt. 83-3, Shapiro Decl. at ¶ 24]

On December 20, 2010 Censor registered a copyright with the United States Copyright Office. [Dkt. 79-1, Censor Aff., at ¶ 6 and Exh. G, Certificate of Registration] The Certificate of Registration contains the following relevant specifications regarding the copyright:

> Title of Work: Benefits Essentials
>
> Previous or Alternative Title: HR & Benefits Essentials
>
> Date of 1st Publication: November 20, 2010
>
> Author: Martin Censor
>
> Author Created: new and revised text and editing
>
> Material excluded from this claim: previously published versions of website
>
> New material included in claim: new and revised text and editing

[Dkt. 79-1, Censor Aff., at Exh. G, Certificate of Registration]

Censor registered five pages of the Benefits Essentials website with the Copyright Office. [Dkts. 83-2 & 84-2, Ds' 56(a)(1) Statements at ¶ 23; Dkt. 83-4, Cicero Decl. at Exh. 8 (Certificate of Copyright)] These introductory pages, provided with the Certificate of Copyright obtained from the U.S. Copyright Office on February 15, 2012 by Defendants, include those titled "Welcome to HR & Benefits Essentials, Information Every Business Needs to Know," and "Welcome to the HR and Benefits Library an Award-Winning Business Compliance Resource Center." The Certificate certifies that "the attached color photocopies are a true

representation of the work entitled BENEFITS ESSENTIALS deposited in the

Copyright Office with claim of copyright registered under TX 7-354-094." [Dkt. 83-

4, Cicero Decl. at Exh. 8 (Certificate of Copyright)]

    **III.**   <u>**Standard of Review**</u>

        **a.  Motion for Summary Judgment**

      Summary judgment should be granted "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law.'" Fed. R. Civ. P. 56(a). The moving party bears the burden of

proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106

(2d Cir.2010). "In determining whether that burden has been met, the court is

required to resolve all ambiguities and credit all factual inferences that could be

drawn in favor of the party against whom summary judgment is sought." *Id.,*

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91

L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the

record that could reasonably support a jury's verdict for the nonmoving party,

summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation

marks and citation omitted).

      "A party opposing summary judgment cannot defeat the motion by relying

on the allegations in his pleading, or on conclusory statements, or on mere

assertions that affidavits supporting the motion are not credible. At the summary

judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

IV. <u>Discussion</u>

a. Breach of Contract

Censor alleges that ASC breached the Joint Venture Agreement by (1) unilaterally terminating the agreement without providing an accounting [Dkt. 1, Comp. at ¶¶ 36]; (2) failing to pay Censor his fifty per cent share of the profits derived from Benefits Essentials [Dkt. 1, Comp. at ¶ 44(a)]; (3) diverting income from the joint venture in violation of ASC's obligation to host the site on its servers and/or at its expense, and diverting income to Ceconi and Shapiro [Dkt. 1, Comp. at ¶¶ 38, 39, 44(b)]; (4) failing to pay Censor fifty per cent of the profits of the transfer of Benefits Essentials to HR 360 [Dkt. 1, Comp. at ¶ 44(c)]; and (5) infringing his copyright in the contents of Benefits Essentials. [Dkt. 1, Comp. at ¶¶ 39, 44] Defendant ASC has moved for summary judgment on the basis that (1)

16

the plain language of the Joint Venture Agreement gave ASC the right to unilaterally withdraw [Dkt. 83-1 ASC MSJ at pp. 16-17 ]; and (2) Censor was not entitled to fifty per cent of the profits of the joint venture [Dkt. 83-1 ASC MSJ at pp. 17-20]. Defendants Shapiro, Ceconi and HR 360 have moved for summary judgment on the argument that they were not parties to the contract between ASC and Censor and Censor has provided no evidence to suggest that Shapiro, Ceconi or HR 360 were alter egos of ASC. Defendants have counterclaimed for breach of contract, alleging that beginning in 2008 Censor failed to update the website regularly, forcing ASC to hire additional employees and outside contractors to update the content of the website. The parties do not dispute the existence of a valid contract in this action, nor that both parties satisfactorily performed under the contract until around 2008.

In Connecticut, a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages directly and proximately caused by the breach. *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504, 890 A.2d 140 (Conn. App. Ct. 2006). In determining whether breach has occurred, the court must ascertain the contractual rights and obligations of the parties.

> In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . .  Where the language is unambiguous, we must give the contract effect

17

according to its terms. . . .  Where the language is ambiguous, however, we must construe those ambiguities against the drafter. . . .  [A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity . . . .  Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous . . . .  In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself . . . .  [A]ny ambiguity in a contract must emanate from the language used by the parties . . . .  The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . .  If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.

*Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260-61 (Conn. 2011) (quoting *Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734, 873 A.2d 898 (Conn. 2005)). Where a contract term is ambiguous, the court may properly discern the intent of the parties as to the meaning of the contract by considering extrinsic evidence. *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 675 (Conn. 2002). "[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Gurguis v. Frankel*, 93 Conn. App. 162, 168 (Conn. App. Ct. 2006). "Proximate cause is ordinarily a question of fact." *Id.* "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation ... militates against interpreting a contract in a way that renders a provision superfluous."

18

*Connecticut Nat'l Bank v. Rehab Assocs.,* 300 Conn. 314, 322 (Conn. 2011)

(internal quotation marks and citation omitted).

> i.  Withdrawal

Defendant ASC moves for summary judgment as to Censor's claim that

ASC breached the Joint Venture Agreement by unilaterally withdrawing from the

joint venture. ASC notified Censor of its intent to withdraw from the joint venture

by letter from ASC dated December 10, 2010 which stated that, "after

considerable thought, ASC Technologies of CT, LLC is terminating the joint

venture with you as of 5:00 pm EST on December 17, 2010, and we wish to

commence the process of winding up."  [Dkt. 89, P's Opposition to Ds' MSJ, Exh.

B] ASC contends that its withdrawal was sanctioned under the third term of

Article VI of the Joint Venture Agreement which reads, in relevant part:

> The Joint Venture shall be dissolved upon the
> happening of any of the following events: (a) The
> adjudication of bankruptcy, filing of a petition pursuant
> to a Chapter of the Federal Bankruptcy Act, withdrawal,
> removal or insolvency of either of the parties. (b) The
> sale or other disposition, not including an exchange of
> all, or substantially all, of the Joint Venture assets. (c)
> Mutual agreement of the parties.

[Dkt. 79-1, Censor Aff. at Exh. C, Article VI; Dkt. 83-3, Shapiro Dec. at Exh. 1,

Article VI]  Censor argues that the entirety of section (a) relates to bankruptcy

proceedings only ("Those [terms] are all in relation to a bankruptcy of the joint

venture"). [Dkt. 83-4 Exh. 5, Censor Depo. at 69] however, Censor misreads the

Joint Venture Agreement. Article VI is unambiguous on its face, and thus the

Court must give the contract effect according to its terms. The plain language of the article allows for withdrawal in any one of five situations: (1) the adjudication of bankruptcy of either of the parties; (2) the filing of a petition pursuant to a Chapter of the Federal Bankruptcy Act by either of the parties; (3) the withdrawal of either of the parties; (4) the removal of either of the parties; or (5) the insolvency of either of the parties. There is nothing in the Agreement which makes a petition pursuant to or the adjudication of bankruptcy a precursor to dissolution by withdrawal nor does the Agreement restrict a party from withdrawing from the joint venture. The plain language of the Agreement makes each of the bases for dissolution independent of each other.  Additionally, Censor has produced no evidence in the record to contradict the plain language of the contract allowing either party to withdraw at will. The Court thus concludes that ASC was entitled to unilaterally withdraw from the joint venture by the plain terms of the Joint Venture Agreement and grants summary judgment for ASC as to Censor's breach of contract claim as it relates to withdrawal.

### ii.  Profits Split

Article III – "Allocations" clearly and unambiguously provides that profits, losses and other allocations are to be divided equally between Censor and ASC:

> Commencing on the date hereof and ending on the termination of the business of the Joint Venture, all profits, losses and other allocations to the Joint Venture shall be allocated quarterly, as follows: Fifty percent (50%) to ASC and fifty percent (50%) to Censor.

**[Dkt. 79-1, Censor Aff. at Exh. C, Article III; Dkt. 83-3, Shapiro Dec. at Exh. 1, Article III]  ASC and Censor rethought this split of profits in late 2008 as a result of, ASC contends and Censor does not dispute, ASC's assumption of expanded editorial duties due to subscribers' demand for expanded content on the website, necessitating increased maintenance of the site, and Censor's reduction in time spent updating and editing its contents. [Dkt. 83-1, ASC MSJ at p. 18; Dkt. 83-3, Shapiro Decl. at ¶14] Shapiro emailed Censor on December 23, 2008 summarizing a deal they had worked out regarding the profits split whereby Ceconi and Shapiro would receive "an additional 15% from existing sales and 15% from new sales commissions" and Censor would receive "a minimum of $6,000 a month from the business or we will recalculate our increased percentage to make this work for your needs." [Dkt. 83-3, Shapiro Decl. at Exhibit 3; *see also* Dkt. 1, Comp. at Exh. B] Censor replied to Shapiro's email by stating "OK. But (there's always a "but")…" and subsequently proposing that the parties agree to cut down on any outside expenses "during the next two months' trial period," allowing the parties to "focus on the product, and gauge if this new arrangement is working out."  [*Id.*] On January 2, 2009 Shapiro assented to Censor's proposal: "will do-- maintenance as you mentioned is necessary to make sure everything stays working and accurate." [*Id.*]**

**ASC argues that this email chain constituted a change in the terms of the Joint Venture Agreement. Censor denies this and contends that he never agreed to a change in the profit split and that a rider to the Agreement would have been required to change the percentage of profits due to him. The Court finds that, as a**

matter of law, this writing constitutes a change in the profits split between the parties. The Agreement specifically provides for its amendment by "such other and further instruments and documents as are or may become reasonably necessary or convenient to effectuate and carry out the purposes of this Agreement." [Dkt. 79-1, Censor Aff. at Exh. C, Article VII; Dkt. 83-3, Shapiro Dec. at Exh. 1, Article VII] Although Article III clearly divides the profits due to Censor and ASC equally, Article VII effectively allows the parties to amend the Agreement as necessary or convenient to carry out the purposes of the Joint Venture Agreement. The Agreement does not require such amendments to be written, nor does it require formalization in a rider to the Agreement. Per the plain language of Article VII, Censor and ASC could modify the Joint Venture Agreement by email if they so chose.

Accordingly, the Court now looks to the December 2008 email chain to determine if it constituted an amendment to Article III of the Joint Venture Agreement.[4] The Court concludes that it did. The subject line of Shapiro's first email to Censor is "summary of our deal." The text that follows proposes a modified split of profits whereby ASC would receive a larger percentage of existing sales and sales commissions, and Censor would receive a minimum of $6,000 per month. Censor's contention that his reply to this proposal ("OK. But (there's always a 'but')…") does not constitute his consent is not credible. His response - "OK" - plainly indicates assent to the new terms of the profits split on

---

[4] The Court notes that Censor himself provided this email chain to the Court as an exhibit to his Complaint, as proof that ASC reduced his contractual share of the joint venture's profits.

a trial basis. It also, as indicated by the presence of the "But," proposes a condition under which Censor consents to the new terms: that the parties cut down on outside expenses during the two month trial period. Nowhere in the response does Censor reject the terms of the proposed profits split. Shapiro subsequently responded by email and agreed to Censor's condition.

Censor maintains that he later rejected the reduced split in his profits perhaps by email or by discussion. [Dkt. 83-4 Exh. 5, Censor Depo. at 90] He points to an email chain between him and Shapiro on May 2, 2010, in which he asked if there was any money to be distributed and stated that he had a mortgage and tuitions to pay. [Dkt. 83-3, Shapiro Decl. ¶ 18, Exhibit 4; *see also* Dkt. 1, Comp. at Exh. C] Two days later, Shapiro responded that an extra $1,500 was forthcoming, but that the HR & Benefits Essentials website required full-time management of content and could no longer rely on part-time content staff, referring to the content management policy which the Plaintiff wrote. She told Censor that Benefits Essentials needed a full-time editor and a part-time link checker. She also noted that the venture was paying about $1,000 per month for a person to respond to ask the experts questions. She went on the state that if Censor was willing to devote 9+ hours a day for about $6,000 a month, they could consider terminating the two employees who performed that work, noting that the work would have to be done on a timely basis, all day, every day. [*Id.*] This email exchange confirms that Censor agreed to a change in the profits split and suggests that there was more than one change. Censor explicitly states that he is "not sure any more what the split is these days," which tacitly acknowledges that

23

he had agreed to an earlier reduction of his profits distribution. Moreover, his statement that he had lost track of the current split can only be interpreted as an admission that he had previously agreed to a reduction in his share of profits. Censor's comment that he cannot afford to give up his share does not constitute an objection to reduction in his profits percentage; rather, it simply states his inability to afford any further reductions. Even Shapiro's response supports this conclusion as it offers Censor a means of increasing his share of the profits, namely by performing the essential functions he agreed to perform when the joint venture was formed, but which were being performed by paid staff of the joint venture. Further, Censor admitted in his deposition that he has no recollection and no evidence to refute his admission that he had agreed to a reduction in his split:

> Q.    When did you object to [the proposed change in the 50-50 split of profits]?
>
> A.    I don't recall offhand.
>
> Q.    In what form did you object? In writing?
>
> A.    I don't recall. I, it may have been emails, there may have been discussions…
>
> Q.    Do you have any emails in your possession that would indicate an objection subsequent to the date relating to the proposed change in the 50-50 split in profits . . . ?
>
> A.    I don't know. I would have to check.

[Dkt. 83-4 Exh. 5, Censor Depo. at 89-90]

After this exchange and during the deposition ASC's counsel formally requested "any written materials that would indicate an objection to the proposal to the

December 23rd [2008] email," and further requested such information in follow up discussion with Censor's counsel. [Dkt. 83-4 Exh. 5, Censor Depo. at 93; Dkt. 83-4, Cicero Dec. at 6-8].  Censor produced no written evidence. [Dkt. 83-4, Cicero Dec. at 8] Defendants also served Interrogatory No. 11 on Censor, requesting that Censor "identify any documents or other evidence which support your contention" that the "revised 80%-20% split did not continue in full force and effect through December 2010." [Dkt. 83-4 Exh. 1, Cicero Decl. at p. 9; Dkt. 83-1, ASC's MSJ at 19] Censor responded that the December 23, 2008 email chain

> specifically state[s] that the 'new arrangement' IF APPROVED would be on a trial basis, and would be revisited. I objected thereto, subsequent to the emails on many occasions and demanded my 50%.Obviously, as a matter of law, if there were any such approval, it would require a RIDER to the Joint Venture Agreement. The emails do not state that the purported 'New Arrangement' was ever finalized, nor was there any proof that the 'trial' was resolved, one way or another.

[Dkt. 83-4 Exh. 3, Censor Interrog. Responses at ¶ 11]

The Plaintiff's response is a legal conclusion and does not provide any factual support for his claim. Moreover, the Plaintiff fails to identify any evidence amounting to more than conclusory assertions and his deposition testimony admits that he is not aware of the existence of any evidence to support this claim. Finally, Censor failed to take depositions of any of the parties involved in this action, including of Ceconi or Shapiro, with whom he likely would have raised his objections as to the reduction of his profits percentage, nor did he serve any document requests on Defendants. [Dkt. 83-2, Ds' 56 Statement at ¶ 17; Dkt. 83-4] Nor did Censor address his objection to the profit split in his Declaration in

Opposition to Motion of Defendants for Summary Judgment. [Dkt. 89-1, Censor Dec.] In all, the total evidence on the record supporting Censor's claim for breach of contract due to ASC's failure to pay his fifty per cent profits percentage are the December 23, 2008 and May 2, 2010 email chains between Censor and Shapiro, and Censor's contentions during deposition and in his response to Defendants' interrogatory that he objected to the profits split (but does not remember when or in what form).

For the foregoing reasons, the Court concludes that Censor and ASC agreed to reduce Censor's share of the profits as of the December 23, 2008 email chain between Censor and Lillian Shapiro. The Court must credit all factual inferences in favor of Plaintiff, but Censor is obligated at the summary judgment stage to present admissible evidence in support of his allegations, which he has failed to do. "A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance*

*Co.*, 604 F.3d 712 (2d Cir. 2010). The Court finds that Censor has produced no evidence upon which a jury could properly proceed to find a verdict for Plaintiff on his profits split claim. Therefore, the Court grants summary judgment for ASC as to the allegation of breach of contract for failure to pay Plaintiff his fifty per cent profits from Benefits Essentials, *only* as relates to the parties' amendment of the Joint Venture Agreement pursuant to the December 23, 2008 email chain between Censor and Lillian Shapiro.

However, there remains a material issue of disputed fact as to the numerical percentage of profit to which Censor was entitled per the December 23, 2008 email chain and subsequent to that date. Plaintiff contends that his portion was reduced to 35 per cent of the profits [Dkt. 1, Comp. at ¶ 24(a)], while ASC contends that plaintiff agreed to and did receive twenty per cent of the profits, as reflected in payments from ASC to Censor after December 23, 2008. [Dkt. 83-2, Ds' MSJ 56 Statement, at ¶¶ 10, 11] While the Court believes it likely based on the December 23, 2008 email that the split became 80/20, there is no evidence in the record to indicate which calculation is correct; the email exchange is ambiguous as to the exact reduced percentage, and neither party has provided additional evidence of the *actual* reduced percentages involved in the profit split. Therefore, because a disputed issue of material fact exists as to whether the profits split was 65/35 or 80/20, the Court reserves this question for an accounting hearing or, alternatively, for trial.[5] The Court also declines to rule on any further profits

---

[5] To the extent that the Plaintiff has set forth breach of contract claims in the Complaint not addressed by the Defendants in their summary judgment motions

reduction after the reduction agreed to in the December 23, 2008 email chain, and thus denies summary judgment as to a further reduction of profits.

          i.     Breach of Contract as to Ceconi, Shapiro, and HR 360

Defendants Ceconi, Shapiro, and HR 360 move for summary judgment to the extent that Censor asserts breach of contract claims against them. The Court notes that Censor alleges his breach of contract claims specifically against Defendant ASC. However, the Complaint is unclear and thus sufficiently vague as to be construed to assert breach of contract claims against Ceconi, Shapiro and HR 360. To the extent that Censor alleges these claims against these defendants, the Court concludes that summary judgment is proper as to Defendants Ceconi, Shapiro and HR 360 as individuals, as Censor has failed to allege facts sufficient to pierce the corporate veil.

In Connecticut,

> [w]hen determining whether piercing the corporate veil is proper, our Supreme Court has endorsed two tests: the instrumentality test and the identity test. The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and

---

(and thus not addressed in this Memorandum of Decision), those claims may, if Plaintiff so chooses, proceed to trial.

> breach of duty must proximately cause the injury or unjust loss complained of. . . The identity rule has been stated as follows: If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise....

*Breen v. Judge*, 124 Conn. App. 147, 152-53 (Conn. App. Ct. 2010) (internal quotation marks omitted) (affirming trial court's decision not to pierce the corporate veil where plaintiff had failed to provide sufficient evidence that defendant individual and limited liability corporation were one and the same).

Here, Censor has failed to allege that Ceconi and Shapiro exerted such influence over ASC that it had no independent existence. Censor alleges and Defendants concede that Shapiro and Ceconi were agents of ASC. However, Censor utterly fails to provide any proof on the record that Ceconi or Shapiro exercised complete dominion over ASC such that ASC had no separate mind, will, or existence of its own, or that there was "such unity of interest and ownership" that ASC was not in fact its own independent entity. At the summary judgment stage, Censor must present admissible evidence in support of his allegations and allegations alone are not sufficient to defeat summary judgment. *Welch–Rubin*, 2004 WL 2472280, at *1. Plaintiff has failed to present any evidence beyond his conclusory allegations in the complaint that would support piercing ASC's corporate veil and holding Ceconi and Shapiro personally liable. Thus, Defendants Shapiro's, Ceconi's and HR 360's Motion for Summary Judgment as to Plaintiff's breach of contract claim is granted.

### b. Breach of Fiduciary Duty and Action for an Accounting

Censor's claim of breach of fiduciary duty by Defendants ASC, Shapiro and Ceconi stems directly from his claims of breach of contract, copyright infringement, and fraud: he claims that by infringing his copyright, failing to pay him his portion of the profits of the joint venture, and diverting joint venture assets to HR 360 and to the personal accounts of Ceconi and Shapiro, defendants have violated their fiduciary duties in order to "coerce [Censor] to consent to dissolution [of the joint venture] without an accounting." [Dkt. 1, Comp. at ¶ 52] Censor bases his claim for breach of fiduciary duty and his demand for an accounting on the existence of a joint venture as memorialized in the Joint Venture Agreement signed April 11, 2003. Censor has filed a Motion for Partial Summary Judgment Directing an Accounting.  [Dkt. 79-3]

As an initial matter, the Court notes that the record reflects that ASC attempted to provide Censor with an accounting prior to the commencement of this action, together with other customary concessions incident to the winding-up of the joint venture.  Censor preempted those submissions by filing this action.

Defendants counter-move for summary judgment on the breach of fiduciary duty claim, contending that the relationship between ASC and Censor is not a joint venture. Defendants argue that Censor failed to exercise the requisite control over the enterprise, Censor did not intend to form a joint venture, and Censor and ASC did not form a separate business entity; therefore ASC owes

Censor neither fiduciary duties nor an accounting. Censor counters that he exercised enough control to have been a member of a joint venture, that the intent of the parties was clear, and that a separate business entity is unnecessary to form a joint venture. Defendants Ceconi, Shapiro and HR 360 additionally move for summary judgment on the basis that, because they were not parties to the Joint Venture Agreement and because Censor presented no evidence that they were alter egos of ASC, they are not fiduciaries and may not be liable for breach.

The Court holds that based on the plain language of the Joint Venture Agreement and the conduct of the parties, a joint venture existed between Censor and ASC. Therefore, as a matter of law, ASC and Censor owe to one another fiduciary duties akin to those in a common law partnership, including the right to an accounting.[6] Consequently, the Court grants in part and denies in part Plaintiff's Motion for Summary Judgment Directing an Accounting, granting to the extent it seeks an accounting of the Benefits Essentials joint venture only. The Court further grants in part and denies in part Defendants' Motions for Summary Judgment as to Plaintiff's claim for breach of fiduciary duty.

---

[6] Censor requests that the Court order an accounting hearing "pursuant to the subpoenaed records, or records to be subpoenaed, at which the joint venturers, and all of these defendants, and their witnesses, must produce the records of the joint venture, and the records of HR 360 INC., and account to each other. An accounting hearing, under the circumstances herein, must be directed, not only as to banking records of gross income, expenses, and distributions from Benefits Essentials Joint Venture, or from ASC to Plaintiff Martin Censor, and to Defendant ASC Technologies of Ct., LLC., to any of the defendants, to any third parties, and to all 'ASC' entities, namely those entities named in Defendants' attorney's discovery demands (Interrogatories, Document demands, etc.) Rather, it must include all considerations of willfulness and impropriety." [Dkt. 79-3, Censor MSJ at ¶ 6-7]. Censor is entitled to a full accounting of the joint venture, Benefits Essentials. He has offered no proof of a fiduciary relationship with any other entity that would give rise to an accounting broader in scope.

### i. Joint Venture

Under Connecticut law, a joint venture "exists where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking." *Doe v. Yale Univ.*, 252 Conn. 641, 673 (Conn. 2000). *See also Lenoble v. Best Temps, Inc.*, 352 F. Supp. 2d 237, 249 (D. Conn. 2005) (quoting same); *Elec. Assoc., Inc. v. Automatic Equip. Dev. Corp.*, 185 Conn. 31, 35 (Conn. 1981) ("A joint venture is a special combination of two or more persons who combine their property, money, effects, skill, and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate designation."). "Although regarded as an informal partnership, joint ventures are generally governed by the same principles that govern common-law partnerships." *Doe*, 252 Conn. at 673-74. *See also R.S. Silver Enters Co., Inc. v. Pascarella*, No. FSTCV065002499S, 2010 WL 3259869, at *28 (Conn. Super. Ct. Jul. 14, 2010) ("The relations and obligations in a joint venture are generally governed by the principles of common law partnership") (quoting *Travis v. St. John*, 176 Conn. 69, 72 (1978)). Thus, "[a]s a matter of law, parties to joint ventures undertake fiduciary duties to each other concerning matters within the scope of the joint venture." *Elec. Assocs.*, 185 Conn. at 35. *See also RS Silver*, 2010 WL 3259869, at *27 (quoting same).

To constitute a joint venture, courts in Connecticut prescribe a five part test that requires that (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit, (2) an agreement must evidence their intent to be joint venturers, (3) each must contribute property, financing,

skill, knowledge or effort, (4) each must have some degree of joint control over the venture, and (5) there must be a provision for the sharing of both profits and losses. *RS Silver*, 2010 WL 3259869, at *28 (citing 46 Am. Jur. 2d, Joint Ventures, § 8); *Schlief v. Abercrombie & Kent, Inc.*, No. X02CV055003467, 2011 WL 2418571, at *6 (Conn. Super. Ct. May 19, 2011); *Mahoney v. Sylvester*, No. 363585, 1993 WL 426082, at *2 (Conn. Super. Ct. Oct. 13, 1993). The Second Circuit has affirmed a practically identical test for joint venture under New York law. Thus, the Second Circuit's affirmation constitutes controlling precedent for this Court. *See SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d Cir. 2004); *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990).

### 1.   Common Enterprise and Joint Control

Defendants contend that the relationship between Censor and ASC does not meet the first or fourth prongs of the joint venture test because Benefits Essentials was not a separate business entity, the relationship between Censor and ASC was that of author to publisher, and because Censor did not exercise joint control over the enterprise. Defendants' contentions, though, are without merit.

ASC argues without citation to any case law or other authority that because no separate entity was established to operate the business of Benefits Essentials the parties did not create a "common enterprise" as required under the first prong of the joint venture test. [Dkt. 83-1, ASC MSJ at p. 4] This interpretation,

33

however, holds no sway under the definitions of joint venture as formulated by the Connecticut Supreme Court above. Neither definition, on its face, contemplates that a joint venture must be formed as a *separate* business entity; rather, the definitions suggest that a joint venture occurs where two or more parties combine to carry out a single project for profit. Here, Censor and ASC contracted to carry out a single project – the Benefits Essentials website – for profit.

Nor is it correct as a matter of law to classify the relationship between Censor and ASC as that of an author to a publisher and thus preclude finding a joint venture, as ASC contends, again without citation to any case law or other authority. Although Connecticut law is scant on the subject, other courts have ruled that an author/publisher relationship may not necessarily satisfy the test for a joint venture. For example, in a tax action by the famous author against the New York City Comptroller, the Court of Appeals of New York ruled in *Steinbeck v. Gerosa* that, where Steinbeck's agents had negotiated contracts for the licensing of certain rights to his literary works,

> The sums payable to petitioner by way of royalties were merely the price for the licensing of certain of his literary rights. The sales made by the publishers and the gross receipts from the motion pictures were simply the means by which the price for the licensing of Mr. Steinbeck's literary rights were ultimately to be determined. On the contrary, it must be said that the source of Mr. Steinbeck's income was not the sales made by the publisher, but the contracts made between him and his publisher in New York City.

34

4 N.Y.2d 302, 318 (N.Y. 1958). Although defendants have characterized the relationship between Censor and ASC as one of author to publisher (and Censor agreed with this classification during his deposition by responding that "the shorthand, if you will" classification of his arrangement with ASC was that he was an author and ASC a publisher), the Court disagrees with this characterization as a matter of law and therefore distinguishes the author/publisher cases denying a joint venture. [Dkt. 83-1, ASC MSJ at p. 3; Dkt. 83-4 Exh. 5, Censor Depo. at 54]

Censor and ASC enjoyed a much more in depth business relationship than classifies the typical author/publisher relationship, such as the one described in *Steinbeck*. ASC and Censor entered into a contract to develop, maintain, and grow a dynamic and ongoing product. Censor provided written content for the website, but also agreed to edit and update that content, provide new analysis and insight, respond as an expert to questions about the content from subscribers, and "share equally in the operations and decisions of the joint venture." [Dkt. 79-1, Censor Aff. at Exh. C, Article II; Dkt. 83-3, Shapiro Dec. at Exh. 1, Article II] The share of profits that Censor collected from Benefits Essentials was not "merely the price for the licensing of certain of his literary rights" as royalties payments were for Steinbeck; it was the price for Censor's ongoing work on and development of a single project undertaken by both ASC and Censor for profit. The relationship between Censor and ASC was not akin to the author/publisher relationship at its inception.

Closely related to the above contention is ASC's argument that Censor did not exercise joint control over the venture and thus the parties' relationship must

fail the fourth prong of the joint venture test. [Dkt. 83-1, ASC MSJ at p. 4] ASC submits the following evidence to support its contention that it exercised sole control over the Benefits Essentials website: ASC most recently owned the domain name for the Benefits Essentials website, hosted the website on its servers, maintained the website, and provided office space for the operations of the website [Dkt. 83-3, Shapiro Dec. at ¶ 11]; ASC performed "the entire business of marketing subscriptions" to the website, managed all client issues and customer support, and "over[saw] all non-editorial staff and some editorial staff," and collected all subscription fees [Dkt. 83-3, Shapiro Dec. at ¶ 11]. In fact, Censor testified during deposition that he was not involved with customer billing or bookkeeping or with customer technical support, and was not involved in administration of the website other than making editorial changes to its content. [Dkt. 83-4 Exh. 5, Censor Depo. at 55-57]

Crucially, though, the plain language of the Joint Venture Agreement and the conduct of the parties evidences that Censor exercised joint control over Benefits Essentials and therefore, as a matter of law, has met prong four of the joint venture test. Article II, entitled "Obligations of the Joint Venturers," states that

> All parties share equally in the operations and decisions of the Joint Venture. The parties agree to a split of duties between themselves as follows:
>
> Martin Censor is primarily responsible for updating the content.
>
> ASC is primarily responsible for marketing and technology (i.e., site development and maintenance).

> ASC will host the site on its servers and/or at its
> expense.

[Dkt. 79-1, Censor Aff. at Exh. C, Article II; Dkt. 83-3, Shapiro Dec. at Exh. 1, Article II]  The unambiguous language of the Agreement provides for equal control of the joint venture by both ASC and Censor; the Article on its face is not susceptible to differing interpretations and thus the Court credits its terms as valid. Furthermore, the Agreement divides the operations and decisions of the Joint Venture equally while specifically taking into account the differing roles that ASC and Censor would play. Notably, the third prong of the joint venture test prescribes that joint venturers must each contribute *either* property, financing, skill, knowledge, *or* effort. *RS Silver*, 2010 WL 3259869, at *28 (citing 46 Am. Jur. 2d, Joint Ventures, § 8); *Schlierf*, 2011 WL 2418571, at *6; *SCS Commc'ns, Inc.*, 360 F.3d at 341. Case law is clear that differing contributions among parties may constitute a joint venture. For example, Connecticut courts and the Second Circuit have found joint ventures in situations where one party contributes financing to establish the common enterprise of the joint venture, while the other party manages or runs the enterprise or business operation. *See, e.g.*, *Durante v. Martinez*, No. NNHCV084043410S, 2012 WL 3517592 (Conn. Super. Ct. Jul. 12, 2012) (recognizing a joint venture to build a house between a home builder providing construction expertise and a party providing cash to finance the venture); *Scholastic, Inc. v. Harris*, 259 F.3d 73 (2d Cir. 2001) (recognizing a joint venture to form a new production company to be financed by Scholastic and managed by Harris, a television and movie executive); *Lesser v. Smith*, 115 Conn. 86 (Conn. 1932) (finding that a group of people trading in securities for mutual

profit was a joint venture where stockbroker contributed judgment, knowledge and discretion and other members contributed cash).

Censor and ASC brought different skills to the table in operating Benefits Essentials; Censor's role was primarily content-based, while ASC's was technical and administrative. ASC hosted the website and maintained the website on its servers, provided office space for the operations of the website, marketed subscriptions, managed client issues and customer support, "over[saw] all non-editorial staff and some editorial staff," and collected all subscription fees [Dkt. 83-3, Shapiro Dec. at ¶ 11]. Censor, on the other hand, did not provide administrative support to the website; his role included editing and updating the website's content and corresponding directly with customers through a link on the website from which customers could pose questions and offer feedback, preparing webinars for dissemination on the site, answering the "Ask-the-Experts" questions posed by subscribers, developing and maintaining a monthly newsletter and blog, and preparing press releases. [Dkt. 89-1, Censor Dec. at ¶ 4]. Censor also contends – and ASC does not dispute – that he marketed the website by contacting potential subscribers, entered Benefits Essentials into various contests for best website (including the Apex Awards and Magnum Opus Awards), and maintained contact with large subscribers. Although their roles differed, the plain language of the Agreement and the evidence in the record are clear that both parties exercised some joint control over Benefits Essentials.

2.  **Intent to Enter a Joint Venture; Sharing of Profits and Losses**

38

ASC also argues that Censor "did not intend to enter into a joint venture, because he expected he would not split the profits and losses of the enterprise," thus failing prongs two and five of the joint venture test. [Dkt. 83-1, ASC MSJ at p. 7] "The relationship between contracting parties cannot amount to a joint venture unless the parties so intend." *Elec. Assoc.*, 185 Conn. at 36 (collecting cases); *Schlierf*, 2011 WL 2418571, at *6 (quoting same); *Dehm Drywall, LLC v. Geary*, No. WWMCV085003665S, 2011 WL 4509527, at *12 (Conn. Super. Ct. Apr. 20, 2011) (quoting same, and failing to find joint venture where no evidence was presented of intent to form such). *See also Itel Containers*, 909 F.2d at 701 (holding that all elements of the five prong test for joint venture must be present before joint venture liability may be imposed); *Precision Testing Labs., Ltd. v. Kenyon Corp. of Am.*, 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986) (under New York law, "the existence of an agreement manifesting the intent of the parties to be associated as a joint venture" is an "essential element of a joint venture"); *Zeising v. Kelly*, 152 F. Supp. 2d 335, 348 (an agreement manifesting the intent of the parties to form a joint venture "is crucial because a joint venture is a voluntary relationship, the origin of which is wholly *ex contractu*, i.e., it is not a status created from law.") (internal citation and quotation marks omitted).

In support of its contention, ASC tenders the following portion of Censor's deposition testimony:

> Q.     So the [Joint Venture] agreement allocates the profits 50-50 between the parties; is that correct?
>
> A.     Yes, it does.

Q.     So we're not talking about a 50-50 split of revenue here, we're talking a 50-50 split of the profits after expenses; is that correct?

A.     We're talking about a 50-50 split of the gross revenue.

Q.     Of the gross revenue?

A.     Yes.

Q.     Let's be clear now: Gross revenue would include expenses. Money applied to expenses - -

[Dkt. 83-4 Exh. 5, Censor Depo. at 79]

ASC contends that under Censor's interpretation of the Agreement and his apparent assumption that his fifty percent of the profits came out of gross revenue, he would never split any losses, which demonstrates that he did not intend to enter a joint venture in the first place. However, the deposition testimony provided by ASC on the record is incomplete; ASC has submitted only the small exchange above, and has failed to supply the resolution of this line of questioning, presumably continued on subsequent pages, which may or may not have contained a clarification of Censor's answer. In any case, Censor's testimony does not speak to his intent in forming a joint venture, it only speaks to Censor's understanding of how the *profits* were to be split (although it is unclear from the testimony if Censor understood the question posed to him); the line of questioning does not delve into Censor's understanding of losses. In a declaration submitted by Censor in opposition to Defendants' Motions for Summary Judgment, Censor attests that he would share half of the losses, if losses were ever incurred by the joint venture:

> A*s* owner of 50% of Benefits Essentials, and pursuant to the Joint Venture Agreement, if there were losses (a question not asked [in deposition]) I was to share in such losses. At no time in the existence of Benefits Essentials did I ever receive a communication from the administrators of the Joint Venture (ASC having solely administrative duties) that there was a loss for which I was required to make a contribution.

[Dkt. 89-1, Censor Dec. at ¶ 5(c)]

Notwithstanding the murky deposition testimony provided by defendants, ASC's argument that the parties had no agreement to share losses is untenable on its face as the Agreement specifically provides for the sharing of both profits and losses. Article III of the Agreement, "Allocations," states:

> Commencing on the date hereof and ending on the termination of the business of the Joint Venture, all *profits, losses and other allocations to the Joint Venture* shall be allocated quarterly, as follows: Fifty percent (50%) to ASC and fifty percent (50%) to Censor.

[Dkt. 1, Compl. at Exh. A, Article III; Dkt. 36-1, Article III] (emphasis added)

The Article is unambiguous on its face and is not susceptible to differing interpretations, and thus the Court must credit this language as indicative of the intent of the parties. The plain language of the Article makes clear that the parties intended to share losses as well as profits. Resolving all ambiguities and crediting all factual inferences in Censor's favor, the Court finds no support to credit ASC's contention that Censor did not intend to form a joint venture.

On a broader scale, none of the evidence in the record contradicts the conclusion that the parties intended to form a joint venture. The parties

41

knowingly titled their contract a "Joint Venture Agreement" and repeatedly referred to their relationship as a joint venture in their communications with one another. In ASC's December 10, 2010 letter to Censor  terminating the relationship, ASC concluded that, "after considerable thought, ASC Technologies of CT, LLC is terminating the joint venture with [Censor] as of 5:00 pm EST on December 17, 2010 . . ." [Dkt. 89, P's Opposition to Ds' MSJ, at Exh. B] ASC continued by proposing to Censor that ASC "turn our discussion with [Censor] to complete the winding up of the joint venture." [*Id.*] Likewise, Ceconi pointed out in his December 22, 2010 letter to Censor that "in the absence of specific limitations, joint ventures are terminable at will. With regards to the legal issues you raised, it is our position that we have the absolute right to withdraw from the joint venture." [Dkt. 79-1, Censor Aff., at Exh. C] Nowhere in the parties' correspondence with one another is there any hint that either Censor, Shapiro, Ceconi or ASC intended to form anything but a joint venture. In addition, the Court notes that the parties in this action are sophisticated; Censor is an attorney specializing in employment and benefits law and Ceconi and Shapiro were registered agents and officers of ASC, and founders of HR 360. [Dkt. 79-1, Censor Aff., at ¶ 6; Dkt. 83-3, Shapiro Decl. at ¶ 21] The Court further notes that Defendants do not contest their own intent to form a joint venture; rather, they argue only that Censor did not have the requisite intent to form a joint venture, a contention the Court discredits as a matter of law. Absent evidence contradicting the plain language of the parties, this Court may not read into the Agreement a different intent than the plain language of the contract dictates.

To conclude, the relationship between Censor and ASC meets the five requirements for a joint venture. Censor and ASC entered into the Joint Venture Agreement on April 11, 2003 to finalize their roles in developing and maintaining for profit the Benefits Essentials website and the parties do not dispute that the goal of running the online business was to make a profit; the Agreement evidences Censor's and ASC's intent to be joint venturers; the Agreement contains a provision for sharing both profits and losses; and both Censor and ASC had, as a matter of law, joint control over Benefits Essentials.

### ii.  Judicial Admission and Motion to Amend

The Court now addresses Censor's additional argument that ASC admitted through judicial admission in its pleadings that its relationship with Censor constituted a joint venture.  The defendants, on the other hand, deny this contention and move to amend their Answer to state that the business relationship between Censor and ASC did not constitute a joint venture. [Dkt. 81-1, Ds' Motion to Amend] The Court concludes that Defendants' statements to the Court constitute a judicial admission of the existence of the joint venture and therefore deny Defendants' Motion to Amend its Answer and Counterclaims.

Judicial admissions are "statements of fact rather than legal arguments made to a court." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005). "Facts admitted by a party are judicial admissions that bind that party throughout the litigation." *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir.

43

2009) (internal citations omitted). "A court can appropriately treat statements in briefs as binding judicial admissions of fact." *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) (finding that a fact footnoted in a pleading by counsel constituted a judicial admission). The statement that the parties formed a joint venture is both a legal conclusion and a statement of fact. Whether a relationship is a joint venture is a question of law; but the characterization of the relationship is a statement of the utterer's intent.

Defendants' Answer references the existence of a joint venture several times. Paragraph 12 of Defendants' Answer reads "Defendants admit that Censor and ASC Technologies of CT, LLC entered into a Joint Venture Agreement on April 11, 2003." [Dkt. 36, Ans. at ¶ 12] Paragraph 23 of Defendants' Answer likewise states that "[u]pon the withdrawal of ASC from the joint venture, the content of the Benefits Essentials website was returned to Censor, pursuant to the terms of the Joint Venture Agreement." [Dkt. 36, Ans. at ¶ 12] Here, Defendants' counsel's statement of fact as to the existence of a joint venture constituted an admission of a party. It was made in a legal pleading filed with this Court and Defendants' counsel was acting in an authorized capacity when making the assertion. Thus, counsel's assertion as to the existence of a joint venture constitutes a binding judicial admission of fact. The Court notes, though, that Defendants' judicial admission is irrelevant to the Court's conclusion that a joint venture existed, as the existence of such judicial admission does not alter in any way the Court's prior analysis that the relationship constituted a joint venture.

Defendants move to amend their Answer to state that the business relationship between Plaintiff and ASC did not constitute a joint venture, and that the alleged joint venture had no assets that it held in its own name. [Dkt. 81-1, Ds' Motion to Amend, at p. 1] Defendants also request leave to add counterclaims for forgery under Connecticut law and for unreasonable and vexatious expansion of litigation under 28 U.S.C. § 1927. [*Id.*]

Under the Federal Rules of Civil Procedure, a party may amend a pleading "only with the opposing party's written consent or with the court's leave," which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Although the Federal Rules provide that leave to amend be freely given, "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). However, a court should deny leave to amend only upon a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002). "When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other

extrajudicial admission made by a party or his agent." *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 198 (2d Cir. 1929).

As this Court has concluded above, the relationship between Censor and ASC was a joint venture as a matter of law, regardless of the existence of Defendants' judicial admissions. Additionally, Censor filed this action on February 4, 2011 and Defendants filed their Answer on May 23, 2011. Discovery closed on January 16, 2012 and Defendants filed the motion at issue on February 22, 2012. Defendants had access to the Joint Venture Agreement from the inception of this litigation and were aware of Censor's claim for breach of fiduciary duty and an accounting based on the existence of a joint venture from the date on which Censor filed his complaint – February 4, 2011. Almost nine months passed between the date on which Defendants filed their Answer and the date of their Motion to Amend. Defendants argue that this delay is inapposite, as "the proposed amendments are based in large part on facts learned during Mr. Censor's deposition testimony," the transcript of which Defendants received only three weeks before filing the instant Motion. [Dkt. 87, Ds' Reply to P's Opp. to Motion to Amend, at p. 5] Defendants do not assert what evidence they gleaned from Censor's deposition testimony that led them to file this motion, but as far as the Court can tell, the only new evidence that Defendants discovered was Censor's alleged confusion about the split of profits, which Defendants took as Censor's lack of intent to form a joint venture. As there are no facts to support and many facts to contradict Defendants' arguments that Censor did not intend to form a joint venture, amendment to reflect this deposition testimony is futile.

46

Likewise, because a joint venture existed between the parties as a matter of law, Defendants' request to amend the Answer as to a lack of joint venture assets held by the joint venture would also be futile. *Mackensworth v. S.S. Am. Merchant*, 28 F.3d 246 (2d Cir. 1994) (upholding district court's denial of amendment where amendment was futile due to statute of limitations). For the foregoing reasons, amendment of Defendants' Answer to negate the existence of a joint venture and to state that the joint venture held no assets is denied.

Defendants also seek to add two counterclaims to their Answer: the first for forgery under Connecticut law, and the second to assert that Plaintiff has vexatiously and unreasonably multiplied this litigation under 28 U.S.C. § 1927 based in large part on information the Defendants' claim they discovered during the deposition of Martin Censor roughly five weeks before the filing of their Motion to Amend. Plaintiff opposes addition of these counterclaims based on futility, untimeliness, and prejudice to Plaintiff. The Court denies leave to amend both counterclaims.

As stated above, "[i]t is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). *See also Jones v. N.Y. State Div. of Military and Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) (noting that "a district court may properly deny leave when amendment would be futile" and affirming judgment denying leave to amend as futile). "An amendment is futile if it would not survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6)." *Levy v. World Wrestling Entertainment, Inc.*, No. 3:08–cv–01289 (PCD), 2009 WL 2382022, at *2 (D. Conn.

47

July 31, 2009); *Parker v. Columbia Pictures Inds.*, 204 F.3d 326, 339 (2d Cir. 2000) ("Where the amended portion of the complaint would fail to state a cause of action, however, the district court may deny the party's request to amend."). "Accordingly, the court may deny a proposed amendment if it fails to 'state a claim to relief that is plausible on its face.'" *Levy*, 2009 WL 2382022, at *2 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Additionally, courts may deny leave to amend upon a showing of undue delay, but "[the Second Circuit] ha[s] held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion." *Parker*, 204 F.3d at 339. The longer the unexplained delay, though, "the less will be required of the nonmoving party in terms of a showing of prejudice." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993); *Messier v. Southbury Training School*, No. 3:94-CV-1706(EBB), 1999 WL 20907, at *3 (D. Conn. Jan. 5, 1999) (quoting same). A district court does not, however, "abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause. Moreover, . . . a finding of 'good cause' depends on the diligence of the moving party." *Parker*, 204 F.3d at 340 (holding that the Rule 16(b) "good cause" standard, rather than the more liberal Rule 15(a) standard, governs a motion to amend filed after the deadline for amendment of the pleadings set by the district court).

Furthermore, a court must consider and may deny leave to amend based on a finding of undue prejudice to the opposing party, which is "typically the most important consideration in evaluating a motion to amend a pleading."

*Lacher v. C.I.R.*, 32 Fed. Appx. 600, 603 (2d Cir. Mar. 29, 2002). Relevant factors in making a determination of undue prejudice include whether the opposing party would be required to expend significant additional resources to conduct discovery and prepare for trial, whether the amendment will significantly delay resolution of the dispute, whether the opposing party was on notice of the new claim, and whether the new claim derives from the same facts set forth in the original pleading. *See id.* Traditionally, courts have denied leave to amend as unduly prejudicial where a party requests amendment after discovery has ended or the nonmoving party has filed for summary judgment. *See Messier*, 1999 WL 20907, at \*4 (collecting cases); *Enzo Biochem, Inc. v. Applera Corp.*, 243 F.R.D. 45, 49 (D. Conn. 2007) (collecting cases); *Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004) (denying leave to add remotely related counterclaims after the close of discovery and after summary judgment had been filed).

Here, Defendants seek to assert supplemental counterclaims that are remote from and do not arise out of the same nucleus of operative fact as the claims currently at issue in this case. Defendants contend that they should be allowed leave to add claims for forgery of the Joint Venture Agreement that Censor originally filed with his complaint in the Eastern District of New York, arguing that this Agreement contains a forged choice of law provision requiring the application of New York law. They further seek to add a claim for vexatious multiplication of litigation pursuant to federal statute based on Censor's filing of this allegedly forged agreement. Censor, however, conceded to the application of

Connecticut law in this case, thereby making the choice of law provision in the agreement moot.

Furthermore, ASC and Censor have both admitted that they entered into a contract entitled the "Joint Venture Agreement" on April 11, 2003 and both parties agree on the language of the Agreement's operative provisions. The *only* provision of the Agreement in dispute is the choice of law provision; there are no facts in dispute before this Court regarding the validity of the contract submitted by the Defendants containing the Connecticut choice of law provision. Thus, whatever fraud – if any – was committed in relation to the Joint Venture Agreement was not committed as part and parcel of the performance of the underlying contract here.  "[I]f the court finds that 'the issues raised by the amendment are remote from the other issues in the case and might confuse or mislead the jury, leave to amend may well be denied.'" *Stiller*, 221 F.R.D. at 317 (quoting 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1487 at 626-28 (2d ed. 1990)). Defendants' supplemental forgery counterclaim is based on facts that are not relevant to this litigation and a jury may well be confused by competing instructions regarding alleged forgery of the New York law Joint Venture Agreement and the operative nature of the Connecticut law Joint Venture Agreement, where both agreements are identical but for the choice of law provision. Censor, while he does not concede that his version of the Joint Venture Agreement was a forgery and in fact asserts that ASC's version was fraudulent, has conceded to the application of Connecticut law in this case. Thus, presentation of forgery and vexatious litigation claims to a jury would serve no

purpose other than to detract from Censor's other, perhaps legitimate, claims. Indeed, were the Court to allow amendment of Defendants' answer to permit the forgery counterclaim, the Court would be inclined to bifurcate the forgery trial under Fed. R. Civ. P. 42(b) due to the unrelated nature of the claim. *See, e.g., Trilegiant Corp. v. BP Products North America, Inc.*, No. 3:02CV2237(MRK), 2004 WL 813023, at *3 (D. Conn. Apr. 6, 2004) (holding that denial of amendment to include additional unrelated claims was not unduly prejudicial as "it may well be more efficient or at least equally efficient to address these claims in separate actions").

Defendants' request for amendment is also untimely. Defendants have been aware of the conflict between Censor's and Defendants' versions of the Joint Venture Agreement since Censor filed his complaint and it was served on Defendants in March 2011. Indeed, Defendants sought a hearing on October 14, 2011 to resolve the issue of which version of the agreement was authentic and operative for purposes of determining whether New York or Connecticut law applied. The Court granted Defendants' request for a hearing, which was scheduled for January 5, 2012. However, Censor stipulated to the application of Connecticut law in this action by letter to Defendants on October 25, 2011. Subsequently, Censor moved for reconsideration of the evidentiary hearing scheduled for January 5, 2012. On December 13, 2011, the Court ordered Defendants to submit a memorandum of law stating why it was relevant for the Court to determine whether Censor's version of the Joint Venture Agreement was fraudulently created given that Censor had conceded to the application of

Connecticut law. Defendants filed such memorandum of law on December 20, 2011 and asserted that they had proof that the Agreement submitted by Censor was a forgery. By order on December 29, 2011, the Court canceled the evidentiary hearing as unnecessary in light of Defendants' indication of proof of forgery. At no time during this course of events did Defendants file a motion to amend their answer to include a counterclaim for forgery or for unreasonable and vexatious expansion of litigation, although the alleged forgery has been known to Defendants since the inception of this litigation in the Eastern District of New York and service of the complaint on Defendants in March 2011. Discovery has closed in this matter, Censor has filed for partial summary judgment, and trial is imminent. Thus, amendment now would cause undue and unnecessary delay of this litigation and would be unduly prejudicial to Censor. *See, e.g.*, *Stiller*, 221 F.R.D. 316 (denying leave to amend where amended complaint added claims "different in character and purpose form those articulated in the initial complaint" and where new facts requiring additional discovery would lead to undue delay and prejudice to the nonmoving party); *Parker*, 204 F.3d at 340 (holding that a court may deny leave to amend if amendment defies the deadlines set in the scheduling order and where the moving party has failed to assert good cause because of its own lack of diligence regarding timing).

The counterclaims Defendants have proposed, if allowed, would be highly prejudicial to Censor not only because of their untimeliness but because amendment would require Censor to expend significant resources to conduct additional discovery and prepare for trial. Amendment would raise many legal

issues not at issue in the present case and for which discovery would be necessary. For instance, the forgery claim would necessitate discovery regarding which version of the Joint Venture Agreement was the final agreement and whether the parties reached consensus as to the final agreement and as to the choice of law provision,[7] whether there was a course of negotiation of the contract and whether multiple draft versions exist with different choice of law provisions, and who drafted the various versions of the contract, among other issues. None of these issues, as discussed above, is relevant to the action presently before the Court and Plaintiff is correct in his assertion that "[a] dramatically new landscape of legal issues would emerge from the answer defendants propose to file if leave is granted." [Dkt. 86, P's Memo. In Opp. to Ds' Motion to Amend, at p. 7] *See, e.g., Messier*, 1999 WL 20907, at *5 (finding amendment to be unfairly prejudicial partly due to necessity of reopening discovery to respond to new allegations); *Stiller*, 221 F.R.D. at 317 (finding amendment would cause undue delay and be prejudicial where it would allege "new facts that will require additional discovery").

Further, the Court denies amendment to assert a counterclaim for vexatious multiplication of litigation pursuant to 28 U.S.C. § 1927 because such amendment would be futile, as it would not survive a motion to dismiss under

---

[7] The Court notes that Censor, in his Opposition to Defendants' Motion to Amend, has denied that Censor's version of the Joint Venture Agreement is fraudulent and has in turn alleged that Defendants' version of the Joint Venture Agreement containing the Connecticut choice of law provision is fraudulent. "[T]he insertion of the state law [in Defendants' version of the Agreement], namely *Connecticut*, which will govern the rights of the joint venturers, was made in a different type, blatantly inserted over a 'white out.' The only fraud is that of these defendants." [Dkt. 86, P's Memo. In Opp. to Ds' Motion to Amend, at p. 6]

Rule 12(b)(6).  *See, e.g., Parker*, 204 F.3d at 339 ("Where the amended portion of the complaint would fail to state a cause of action, however, the district court may deny the party's request to amend."). 28 U.S.C. § 1927 provides that

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably or vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Section 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants" and is "concerned only with limiting the abuse of court processes." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 762 (1980). Section 1927 sanctions may not be imposed against a party; rather they may be asserted only against counsel. *See Oliveri v. Thompson*, 803 F. 2d 1265, 1273 (2d Cir. 1986) (noting that the only difference between an award pursuant to § 1927 and one pursuant to the court's inherent power is "that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both."); *U.S. v. Int'l Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345-1346 (2d Cir. 1991) ("Rule 11 sanctions may be imposed on both counsel and client, while § 1927 applies only to counsel"). A court may award § 1927 sanctions only "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011) (quoting

*Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009)). In addition, the court must find bad faith and must provide the attorney notice and an opportunity to be heard. *Id. See also U.S. v. Int'l Broth. Of Teamsters,* 948 F.2d at 1345,1346 ("Bad faith is the touchstone of an award under this statute" and § 1927 requires "subjective bad faith by counsel"). "The court's factual findings of bad faith must be characterized by a high degree of specificity." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) (internal quotation marks and citation omitted).

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

Here, Defendants' proposed counterclaim fails to state a claim upon which relief may be granted. First, Defendants allege that Censor filed this action in the Eastern District of New York because that forum was more convenient for him and, in order to substantiate his claim that New York was the proper forum, Censor fabricated the Joint Venture Agreement he attached to his complaint. [Dkt. 81-2, First Amended Answer and Counterclaims, at ¶¶ 11-12] This claim fails to state a claim upon which relief may be granted because Defendants have utterly failed to allege that Censor's counsel – upon whom the Court may levy sanctions under § 1927 – was involved in this alleged fabrication, had any knowledge of this alleged fabrication, knew or should have known that venue was improper, or acted in bad faith. Defendants have alleged only that Censor has multiplied the litigation in this way. Here, Defendants' allegation does not have facial plausibility as Defendants have not only failed to plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, but Defendants have also failed to allege a necessary element of sanctions under § 1927: the attorney's bad faith. As the Court may not sanction Censor under this statute, and as Defendants have not alleged counsel's involvement in this fraud, Defendants have failed to state a claim upon which the Court may grant any relief.

Defendants also seek to allege as part and parcel of their § 1927 counterclaim that Censor improperly moved to disqualify Defendants' attorney, Michael Cicero, on the grounds that one of Cicero's law partners had a prior business relationship with Censor relating to Benefits Essentials, and that

Censor, although he filed a sworn affidavit in support of disqualification, knew that no prior attorney-client relationship between himself and Cicero's law partner existed. This claim is futile and Defendants have similarly failed to allege a claim upon which relief may be granted. First, Censor moved for disqualification before Judge Jack B. Weinstein in the Eastern District of New York. Judge Weinstein noted in his Order on this motion that "[M]otions to disqualify an attorney, generally disfavored in this Circuit, are committed to the discretion of the district court," which may look to supervisory rules such as the New York Rules of Professional Conduct for guidance, but which are not conclusive. [Dkt. 21, Order denying Motion to Disqualify Counsel] Judge Weinstein ruled that Censor had not "alleged facts sufficient to establish a legal basis for disqualification" because he had alleged only that the attorney was a consultant for Benefits Essentials who had reviewed the site and assisted Censor in production of editorial content, not that the two were involved in an attorney-client relationship. [*Id.*] Nowhere in Judge Weinstein's Order, however, is there any mention of bad faith on the part of Plaintiff or his attorney in filing the motion for disqualification. Nor have Defendants pled bad faith anywhere in their proposed counterclaim. Additionally, Defendants have pled no facts that would allow this Court to draw the reasonable inference that Censor's attorney acted in bad faith and is thus liable for vexatious expansion of litigation. Thus, the counterclaim would fail under the pleading standard enumerated in *Iqbal*. 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotation marks and citations omitted). It is entirely plausible that a business relationship between Censor and an attorney with whom he worked on Benefits Essentials, the joint venture at issue in this very case, could form grounds for disqualification of that attorney's law partner.[8] Where the Eastern District of New York made no finding or implication of bad faith, and where Defendants neither plead counsel's bad faith in their proposed amendment nor plead facts that allow the Court to draw the reasonable inference that Censor's attorney should be sanctioned for his conduct, leave to amend is denied. To rule otherwise would inundate the courts with litigation as every entry of dismissal, summary judgment or other unfavorable ruling of a court would give rise to yet another lawsuit or the amendment of a complaint, rendering the courts unable to dispose of any case.

Defendants' motion to amend is therefore denied in its entirety.

---

[8] The Court notes that Rule 1.7 of the New York Rules of Professional Conduct states that "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." Rule 1.7 of the American Bar Association's Model Rules of Professional Conduct states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

### c. Breach of Fiduciary Duty

"The essential elements [of] a cause of action for breach of fiduciary duty under Connecticut law are: 1. That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; 2. That the defendant advanced his or her own interests to the detriment of the plaintiff; 3. That the plaintiff sustained damages; 4. That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." *Godina v. Resinall Int'l, Inc.*, 677 F. Supp. 2d 560, 575 (D. Conn. 2009) (VLB) (quoting *Ives Bros., Inc. v. Keeney*, No. WWMCV064004952S, 2000 WL 35775696, at *5 (Conn. Super. Ct. Oct. 27, 2009). Here, Censor has alleged that ASC, Shapiro and Ceconi have breached their fiduciary duties in that they (1) cut the percentage of profit distributions due to Censor under the Agreement, [Dkt. 1, Comp. at ¶ 50] (2) diverted joint venture assets to other ASC business entities not involved in Benefits Essentials, [Dkt. 1, Comp. at ¶ 50, 51] and (3) infringed Censor's copyright in founding and running HR 360.

Joint venturers owe to one another fiduciary duties akin to those owed by partners in a partnership. Under Connecticut's Uniform Partnership Act, partners (and thus, joint venturers) owe to one another a duty of loyalty and a duty of care. Conn. Gen. Stat. § 34-338. This Court has concluded that ASC and Censor were joint venturers and thus "under[took] fiduciary duties to each other concerning matters within the scope of the joint venture." *Elec. Assocs.*, 185 Conn. at 35.

Accordingly, Defendants' motion for summary judgment is denied in part and granted in part. The Court grants summary judgment for ASC on Censor's breach of fiduciary duty claims as premised on ASC's *initial* reduction of the profits percentage distributed to Censor enumerated in the December 23, 2008 email exchange between Censor and Shapiro. As the parties amended the Joint Venture Agreement to reduce Censor's cut of the profits from Benefits Essentials in order to reflect the changing workloads of the parties, this initial reduction in Censor's profits percentage may not form the basis for a breach of fiduciary duty claim. However, because there are no writings or other evidence to support a further reduction of Censor's profit share of any particular amount, to the extent that Censor objected to a further reduction of his profits, a genuine issue of material fact exists. *See, supra*, Section a.ii. (Profits Split).  Thus, the Court denies summary judgment as to Censor's breach of fiduciary duty claims as premised on any further reduction of the profits percentage distributed to Censor.

The Court also grants summary judgment for Defendants as to Censor's breach of fiduciary duty claim premised on ASC's alleged diversion of assets to other of ASC's business entities. Censor is obligated at the summary judgment stage to present admissible evidence in support of his allegations; Censor may not defeat a summary judgment motion by relying solely on the allegations in his pleading, or on conclusory statements. Here, Censor has alleged no facts that support his contention that ASC diverted joint venture assets to other of ASC's business entities. Thus, Censor's bare assertions of wrongdoing and "allegations

alone, without evidence to back them up, are not sufficient." *Welch–Rubin*, 2004 WL 2472280, at *1.

The Court denies ASC's request for summary judgment on Censor's breach of fiduciary duty claim, though, as it relates to ASC's alleged copyright infringement. As explained later in this Memorandum of Decision, genuine issues of material fact exist as to whether ASC infringed Censor's copyright in the content of Benefits Essentials. Thus, this claim must stand.

i. **Breach of fiduciary duty as against Ceconi, Shapiro, and HR 360**

Censor also alleges his breach of fiduciary duty claims against Ceconi and Shapiro in their individual capacities, contending that Ceconi and Shapiro acted willfully, maliciously, and intentionally "for the sole purpose of applying undue and improper economic pressure on Censor, to coerce him to consent to dissolution without an accounting." [Dkt. 1, Comp. at ¶ 52]  Shapiro and Ceconi argue that personal liability may not attach to them for ASC's breach because Censor has failed to offer any evidence on the record that Censor or Shapiro were acting as alter egos of ASC, thereby allowing ASC's corporate veil to be pierced.

However, the Connecticut Supreme Court has made clear that, where a plaintiff alleges an officer or agent of a corporation has personally committed a tortious act, that agent may be personally liable:

> It is well established that an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an

61

> agent or officer commits or participates in the
> commission of a tort, whether or not he acts on behalf
> of his principal or corporation, he is liable to third
> persons injured thereby.... Thus, a director or officer
> who commits the tort or who directs the tortious act
> done, or participates or operates therein, is liable to
> third persons injured thereby, even though liability may
> also attach to the corporation for the tort.

*Sturm v. Harb Dev., LLC*, 298 Conn. 124, 133 (Conn. 2010) (internal quotation

marks omitted). In *Sturm*, the Connecticut Supreme Court held that the trial court

had improperly concluded that the "plaintiffs were required to allege facts

sufficient to pierce the corporate veil with regard to all counts of the complaint

alleged against the defendant in his individual capacity. The trial court improperly

failed to consider the common-law tort exception that the plaintiffs chose to

invoke as the basis for their individual claims against the defendant." *Id*. at 138.

Under Connecticut law, breach of fiduciary duty is a tort action. *See, e.g.*, *Ahern*

*v. Kappalumakkel*, 97 Conn. App. 189, 192 n. 3 (Conn. App. Ct. 2006) ("Breach of

fiduciary duty is a tort action governed by the three year statute of limitations . .

."). Here, as in *Sturm*, Censor alleges that Ceconi and Shapiro are individually

liable for their direct role in ASC's tortious conduct (the breach of fiduciary duty);

thus, Censor is not obligated to allege facts sufficient to pierce the corporate veil.

Nonetheless, the Court grants summary judgment for Defendants Shapiro

and Ceconi as to Censor's breach of fiduciary duty claims. Censor alleges that

Shapiro and Ceconi (along with ASC) diverted assets to ASC's other business

entities and "deceitful[ly] increase[d]" their own personal income and expenses

in violation of the Joint Venture Agreement. [Dkt. 1, Compl. at ¶ 50] Plaintiff fails,

however, to present any admissible evidence related to this claim other than the allegations stated above. The Court notes that arguably Plaintiff has abandoned this claim by completely failing to develop the factual record with respect to it. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *see also*, *Spencer v. Ellsworth*, No. 09civ.3773, 2011 WL 1775963, at *7 (S.D.N.Y. May 10,2011) (finding that Plaintiff had abandoned certain claims as he "has not substantiated any of these claims and did not attempt to substantiate them in response to the motion for summary judgment."); *Schlenger v. Fidelity Employer Servs. Co.*, LLC, Np.09-cv-3986, 2011 WL 1236156, at *23 (S.D.N.Y. March 31, 2011) ("Plaintiff did not address Count Four in her Opposition to MetLife's Motion for Summary Judgment, and on this basis alone, those claims are deemed abandoned and summary judgment could be granted in MetLife's favor").

Even if Censor had not abandoned such claim there is only one additional bit of evidence in the record corroborating it: Censor states in his Declaration in Opposition to Motion of Defendants for Summary Judgment that he "doubt[s] whether Tom Ceconi or Lillian Shapiro would have had the audacity to charge GE [a Benefits Essentials subscriber] for their gym fees or other expenses; but they seem to have had no qualms about charging those as 'expenses' of the Joint Venture Benefits Essentials." [Dkt. 89-1, Censor Dec. at ¶ 6(c)] At the summary

judgment stage, Censor is required to present admissible evidence in support of his allegations and allegations alone are not sufficient to defeat summary judgment. *Welch–Rubin*, 2004 WL 2472280, at *1. Censor admits that he was not responsible for the administration of the joint venture or for managing its financial affairs. There are no particularized facts in the record to support Censor's claim of personal knowledge of the expense reimbursement practices of the joint venture.  At the summary judgment stage, a conclusory allegation devoid of factual support is insufficient to survive summary judgment. *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) ("A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (internal quotation marks and citations omitted); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (holding that plaintiff's evidence was too conclusory to withstand summary judgment; further holding that "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... Mere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (internal quotation marks and citations omitted). Accordingly, because Plaintiff has failed to present any evidence beyond his conclusory allegations in his complaint, Shapiro's, Ceconi's, and HR

360's Motion for Summary Judgment as to Plaintiff's breach of fiduciary duty claim is granted.

### i.    An Accounting

An accounting is an equitable remedy defined as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due. An action for an accounting usually invokes the equity powers of the court, and the remedy that is most frequently resorted to [] is by way of a suit in equity." *Mankert v. Elmatco Products, Inc.*, 84 Conn. App. 456, 460 (Conn. App. Ct. 2004) (citing 1 Am. Jur. 2d 609, Accounts and Accounting § 52 (1994). *See also Datto v. Braband*, 2012 WL 669027, at *16 (D. Conn. Feb. 29, 2012) (VLB) (quoting same). "To support an action of accounting, one of several conditions must exist. There must be a fiduciary relationship, or the existence of a mutual and/or complicated accounts, or a need of discovery, or some other special ground of equitable jurisdiction such as fraud." *Mankert*, 84 Conn. App. at 460 (citing *C&S Research Corp. v. Holton Co.*, 36 Conn. Supp. 619, 621 (1980)). "[O]ne adventurer is accountable to his or her counterpart under the same principles of equity as require an accounting between partners at common law." *Shuster v. Lyons*, No. CV910036302S, 1997 WL 472419, at *3 (Conn. Super. Ct. Aug. 7, 1997); *see also Travis v. St. John*, 176 Conn. 69, 74 (Conn. 1978). When a partnership is terminated, an accounting is due by right upon termination; the same principles apply upon the termination of a joint venture. *See Roberts v. Weiner*, 137 Conn. 668, 673-74 (Conn. 1951) (ordering an accounting for profits upon termination of a joint venture).

The Court finds that the relationship between Censor and ASC, memorialized both by the Joint Venture Agreement and by the parties' subsequent conduct, constituted a joint venture. Censor, then, was entitled as a matter of law to an accounting upon the termination of the joint venture Benefits Essentials, particularly given the fact that, pursuant to the terms of the joint venture agreement and the conduct of the parties, Censor relied on his joint venture partners to manage the financial affairs of the joint venture. The Court also notes that ASC itself recognized this right to an accounting due to Censor upon termination of the relationship; ASC provided an accounting to Censor in April 2010 at his request, and had offered to provide and were in the process of preparing an updated accounting when Censor filed suit. [Dkt. 83-3, Shapiro Dec. at ¶ 27; Dkt. 83-1, ASC MSJ at p. 22] Ceconi made explicit note to Censor's right to an accounting in his December 22, 2010 letter to Censor discussing the termination of the joint venture. [Dkt. 79-1, Censor Aff., at Exh. C]

Although this Court finds that a joint venture existed between Censor and ASC, even if no joint venture existed, a jury examining all of the facts on the record could conclude that the relationship between the parties was one of fiduciaries and thus gave rise to an accounting. "It is well settled that a 'fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.'" *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (Conn. 2000). "Not all business relationships implicate the duty of a fiduciary." *Id.* "In the seminal cases in which

[the Connecticut Supreme Court] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Id.* Where "[the Connecticut Supreme Court] has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence." *Id.* at 39. Additionally, "[t]he relationship [] between parties to a business agreement has been deemed to involve such confidence and trust so as to entitle one of the parties to an accounting in equity." *Mankert*, 84 Conn. App. at 460-61 (ordering an accounting for plaintiff where plaintiff and defendant entered into a business agreement under which plaintiff served as defendant's technical director and any commissions he earned were divided pursuant to a written agreement) (citing *C&S Research Corp.*, 36 Conn. Supp. at 621).

Here, Censor and ASC entered into a relationship in which there was a unique degree of trust and confidence, and in which both parties displayed superior knowledge, skill and expertise in their respective realms of control. As explored previously, ASC's role in the relationship was administrative and technical; Censor's was content-based and editorial, and Censor brought with him a library of content that formed the basis for the website. Censor did not possess the requisite technical or administrative skills to administer the Benefits Essentials website, and ASC did not possess the expert knowledge of human resources and employment law that Censor brought to the table. Each party was

dependent upon the other's performance for the continued success of Benefits Essentials and memorialized their dependence in the Agreement, specifically dividing their decision-making power equally. [Dkt. 79-1, Censor Aff. at Exh. C, Article II; Dkt. 83-3, Shapiro Dec. at Exh. 1, Article II] Furthermore, this division of control illustrates that the parties were not dealing at arm's length but were rather engaged in a relationship of mutual trust and reliance.  For the foregoing reasons, the Court grants in part Censor's Motion for Summary Judgment for an Accounting; Censor is entitled to a full accounting as to the joint venture Benefits Essentials.  To the extent that Censor seeks an accounting broader in scope than an accounting as to Benefits Essentials, the Court denies summary judgment as Censor has offered no proof of a fiduciary relationship with any other entity that would give rise to a broader accounting.

### d.  Copyright Infringement

Censor contends that ASC, Shapiro, Ceconi and HR 360 infringed his copyright by using the proprietary and copyrighted material that formed the basis for Benefits Essentials to build, operate, sell and otherwise market the new HR 360 website. Defendants move for dismissal for failure to satisfy the statutory prerequisite for bringing such a claim; namely, Censor's failure to register with the U.S. Copyright Office full copyright to the works he claims were infringed. Rather, Defendants allege that Censor's copyright registration covers *only* the five pages of the Benefits Essentials website for which he has a registered copyright. [Dkt. 83-1, ASC MSJ at p. 8] Even if dismissal of Censor's claim is unwarranted, Defendants argue that Censor has failed to identify any document

or work to which he holds copyright that was copied and used by Defendants on the HR 360 website. [Dkt. 83-1, ASC MSJ at p. 8]

The Federal Copyright Act protects "original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). Copyright in a work vests initially in the author or authors of the work. 17 U.S.C. § 201(a). A compilation is a "work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. A collective work, which is a type of compilation, is defined as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. Of collective works, the Federal Copyright Act provides:

> Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

17 U.S.C. § 201(c). To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent

elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Article IV of the Joint Venture Agreement between Censor and ASC, signed on April 11, 2003, provides that Censor is responsible for updating the content of the Benefits Essentials website and specifically gives Censor sole ownership of the copyright content of the website even after termination or dissolution of the venture.  [Dkts. 79-1, Censor Aff. at Exh. C, and 83-3, Shapiro Dec. at Exh. 1, Articles II, IV, VI] On December 10, 2010 ASC terminated the joint venture with Censor by letter, effective December 17, 2010. ASC recognized Censor's ownership of the contents of the website in this letter, affirmatively acknowledging that it would compile and return to Censor the contents of the website. [Dkt. 89, P's Opposition to Ds' MSJ, at p. 5 and Exh. B; Dkt. 1, Comp. at Exh. E] ASC further acknowledged Censor's ownership of the content of the website in Ceconi's December 22, 2010 letter to Censor, in which Ceconi proposed winding up the joint venture. [Dkt. 79-1, Censor Aff., at Exh. C] On December 20, 2010 Censor registered copyright in Benefits Essentials with the United States Copyright Office. [Dkt. 79-1, Certificate of Registration] The Certificate of Registration contains the following relevant specifications regarding the copyright:

> Title of Work: Benefits Essentials
> Previous or Alternative Title: HR & Benefits Essentials
> Date of 1st Publication: November 20, 2010
> Author: Martin Censor
> Author Created: new and revised text and editing
> Material excluded from this claim: previously published
> versions of website

**New material included in claim: new and revised text**
**and editing**

A Certificate of Copyright obtained from the U.S. Copyright Office on February 15, 2012 by Defendants attaches photocopies of five introductory  pages from the Benefits Essentials website, including those titled "Welcome to HR & Benefits Essentials, Information Every Business Needs to Know," and "Welcome to the HR and Benefits Library an Award-Winning Business Compliance Resource Center." The Certificate certifies that "the attached color photocopies are a true representation of the work entitled BENEFITS ESSENTIALS deposited in the Copyright Office with claim of copyright registered under TX 7-354-094." [Dkt. 83-4, Cicero Dec. at Exh. 8]

Censor claims that he registered with the Copyright Office the entire content of the Benefits Essentials website through submission of the disk obtained from Ceconi and ASC after ASC's termination of the joint venture. During deposition, Censor testified that "[t]he entire body of work which was known as Benefits Essentials or HR Benefits Essentials at that time was submitted to the copyright office on this form and that's what this [copyright registration] represents, that body of work, that database, if you will, is registered in the copyright office under my name." [Dkt. 83-4 Exh. 5, Censor Depo. at 17] It appears on the face of the copyright registration, then, that Censor has a valid copyright to the collective work of Benefits Essentials, which contained content authored by Censor, by Ceconi and Shapiro, and by employees and contractors of ASC. Defendants, however, contend that Censor's copyright does not extend to the entire Benefits Essentials website because Censor registered only five

pages of content from the website with the Copyright Office. In support of this assertion, Defendants point to the Certificate of Copyright obtained from the U.S. Copyright Office on February 15, 2012 certifying that "the attached color photocopies are a true representation of the work entitled BENEFITS ESSENTIALS deposited in the Copyright Office with claim of copyright registered under TX 7-354-094." [Dkt. 83-4, Cicero Dec. at Exh. 8]

Defendants argue that Censor has thus failed to register anything more than these five pages with the Copyright Office and therefore cannot claim infringement of other portions of the website.  Plaintiff's pleadings do not affirmatively deny that his registration was based on only five pages of the Benefits Essentials website. [Dkt. 89, P's Memo in Opp. to ASC's MSJ, at p. 18] Crediting all factual inferences in favor of Censor, the Court finds that a genuine issue of material fact exists as to the extent of Censor's copyright and whether it extends beyond the five pages provided as a "true representation" of Benefits Essentials provided by the Copyright Office.

Further, if Censor does in fact own a valid copyright in Benefits Essentials as a collective work, Censor's copyright extends only to the collective work itself and not to the individual submissions that comprise it, unless Censor authored the individual submissions or obtained copyright ownership by transfer from the authors of those submissions. 17 U.S.C.A. § 201; *see, e.g.*, *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001) (holding that freelance authors retained their copyright in their contributions to a collective work; "Copyright in each separate contribution to a collective work is distinct from copyright in the collective work

**72**

as a whole . . . Copyright in the separate contribution vests initially in the author of the contribution. . . Copyright in the collective work vests in the collective author . . . and extends only to the creative material contributed by that author") (internal citations omitted). Additionally, Censor's valid copyright to the collective work is limited to those portions of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the sine qua non of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author.") Where a work is a compilation of fact, the facts themselves are not copyrightable. However, the compilation itself may possess the requisite degree of originality, in that a

> compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. . .

> Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them. *Feist*, 499 U.S. at 348.

Where an author adds no written expression, but rather lets the facts stand on their own, originality is more elusive: "[t]he only conceivable expression is the

manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection." *Id.* Thus the law draws a distinction between the copyright of an author in the content and the copyright of the compiler in the compilation.

Further, ASC owns a copyright in the contributions of its employees as "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C.A. § 201(b). Registration of a copyright in work authored by another does not defeat the owner's copyright in material they authored. "When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11." 17 U.S.C.A. § 201(e).

Here, Censor claims copyright infringement in the collective work of Benefits Essentials. To support his claim, Censor provides twelve screenshots (representing a total of six web pages) taken from the HR 360 website and ten screenshots from the Benefits Essentials website, most of which display introductory pages to portions of the respective websites. [Dkt. 79-1, Censor Aff. at Exh. F] The HR 360 website screenshots show similarities to, and in some

cases are close replicas of, the Benefits Essentials introductory pages in their layout, design and content (some of the text of which appears to be identical between the two websites). Defendants contend that Censor does not hold copyright to the materials included in the screenshots because Censor was not the original author of any of the materials; rather, Ceconi, Shapiro, and ASC employees and outside authors hold original copyright to these elements of the website. [Dkt. 83-1 ASC MSJ at p. 11] Defendants claim that ASC itself holds the copyright to some of the materials. *Id.*

The Court finds that a genuine dispute of material fact exists as to the ownership of a copyright interest in the material in dispute. Censor has submitted on the record examples of Defendants' alleged infringement. Defendants have denied that Censor authored the original materials on which he bases his infringement claims, and claim that some of the pages were authored by Ceconi, Shapiro "and others working under their supervision, and ASC holds the copyright to those materials." *Id*. The Joint Venture Agreement, however, vests copyright ownership in the contents of Benefits Essentials in Censor. At the time the Agreement was drafted, the joint venturers intended that Censor would author the content of Benefits Essentials and provide other professional services. The record indicates that circumstances changed and ASC hired staff to write some of the content for the website and answer subscriber questions. The parties agreed to reduce Censor's share of profits to reflect the changed circumstances; but the parties did not amend the Agreement to reflect this reduction or to modify Censor's ownership of a copyright interest in the content of the website.

Although this copyright may not extend to individual works in which copyright vested in an author other than Censor, the Joint Venture Agreement's assignment of copyright ownership to Censor raises questions as to whether the Agreement assigned ASC's copyright in the content to Censor upon termination of the joint venture. The Agreement is not clear on its face and is silent on the copyright to the compilation as opposed to the content, and thus a trier of fact must determine the intent of the parties. To the extent that Censor may be found to own copyright in works created by ASC based on the Agreement, a genuine issue of material fact exists as to whether the introductory and organizational material on the Benefits Essentials website is sufficiently original such that HR 360 has infringed it. Therefore, summary judgment as to Censor's copyright infringement claim against ASC is denied.

Additionally, to the extent that Censor alleges copyright infringement against Defendants Shapiro and Ceconi, the Court grants summary judgment to those Defendants on the same grounds as those enumerated above as to Plaintiff's breach of contract and breach of fiduciary duty claims. Finally, to the extent Censor claims a copyright in material allegedly authored by others, a genuine issue of material fact exists as to the authorship of the material which registered.

### e. Fraud

Censor alleges that Shapiro and Ceconi, as officers of ASC, "entered into a clandestine and illegal scheme on behalf of ASC" to defraud Censor, and as such

are personally liable for such fraud. [Dkt. 1, Compl. at ¶ 55] Censor contends that Shapiro and Ceconi engaged in "diversion and disposal of the assets of the Joint Venture, including the use of the copyrighted materials and development thereof" and the "diversion of assets to [Ceconi's and Shapiro's] business entities, and a deceitful increase of personal income and expenses."[9] [Dkt. 1, Compl. at ¶¶ 13, 50] Defendants move to dismiss Censor's fraud claims for failure to plead fraud with specificity under Federal Rule of Civil Procedure 9(b) and, in the alternative, move for summary judgment. The Court grants summary judgment in favor of Defendants.

"The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Sturm v. Harb Dev. LLC*, 298 Conn. 124, 142 (Conn. 2010) (*quoting Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P.*, 260 Conn. 766, 777 (Conn. 2002)). "In contrast to a negligent representation, a fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." *Sturm*, 298 Conn. at 142 (internal quotation marks omitted). "This is so because fraudulent misrepresentation is an intentional tort." *Id*. "Additionally, the party asserting such a cause of action must prove the existence of the first three of the elements

---

[9] The Court notes that Censor does not confine his allegations of fraud to his fraud count; the details – scant as they are – are contained in the fact section of Censor's Complaint and in his Breach of Fiduciary Duty count. As far as the Court can discern, these allegations are the extent of Censor's fraud claim.

by a standard higher than the usual fair preponderance of the evidence, which . . .
we have described as clear and satisfactory or clear, precise and unequivocal."
*Duplissie v. Devino*, 96 Conn. App. 673, 681 (Conn. App. Ct. 2006). Further, in
alleging a claim of fraud under Federal Rule of Civil Procedure 9(b), "a party must
state with particularity the circumstances constituting fraud or mistake. Malice,
intent, knowledge, and other conditions of a person's mind may be alleged
generally." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), "the complaint must: (1)
specify the statements that the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made, and (4) explain why
the statements were fraudulent." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124,
1128 (2d Cir. 1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d
Cir. 1993)).

Censor has not pled his fraud allegation with particularity and therefore it
must be dismissed. Censor alleges a broad scheme of copyright infringement
and breach of fiduciary duty by Ceconi and Shapiro, but he fails to specify any
statements made or actions taken by Defendants that would give rise to a fraud
action, fails to state when Ceconi or Shapiro made such statements, and does not
explain why any such statements are fraudulent. Rather, Censor merely alleges
that because Defendants allegedly infringed his copyright, breached the Joint
Venture Agreement, and breached their fiduciary duties, a fraudulent scheme to
do so must have been afoot. This allegation does not pass muster.

Even if Censor has adequately pled fraud and dismissal of his claim is thus
improper, summary judgment in favor of defendants is warranted. Discovery in

this action has closed. Censor, though, has failed to produce a scintilla of evidence on the record that would support a claim of fraud against Shapiro or Ceconi. He has simply not produced any evidence to corroborate his bare assertions of fraud enumerated above. Censor is obligated at the summary judgment stage to present admissible evidence in support of his fraud allegations.  However, he has presented merely conclusory allegations lacking any further support in the record. Where, as here, there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010). Therefore, the Court grants summary judgment for Defendants as to Censor's fraud claim. To the extent that Censor's fraud claim may be construed as against ASC and HR 360, summary judgment is likewise granted.

V.    <u>Conclusion</u>

   For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED in part and DENIED in part. Specifically, the Court

   GRANTS summary judgment for ASC as to Censor's breach of contract claim as it relates to ASC's withdrawal from the joint venture;

   GRANTS summary judgment for ASC as to breach of contract for failure to pay Plaintiff his fifty per cent profits from Benefits Essentials, as relates to the parties' amendment of the Joint Venture Agreement pursuant to the December 23, 2008 email chain between Censor and Shapiro;

**DENIES summary judgment for ASC in regard to any further reduction of Censor's percentage of profits;**

**GRANTS Defendants Shapiro's, Ceconi's and HR 360's Motion for Summary Judgment as to Plaintiff's breach of contract claim;**

**GRANTS summary judgment for ASC on Censor's breach of fiduciary duty claims as premised on ASC's initial reduction of the profits percentage distributed to Censor enumerated in the December 23, 2008 email exchange between Censor and Shapiro;**

**DENIES summary judgment as to Censor's breach of fiduciary duty claims against ASC as premised on any further reduction of the profits percentage distributed to Censor;**

**GRANTS summary judgment for Defendants as to Censor's breach of fiduciary duty claim premised on ASC's alleged diversion of assets to other of ASC's business entities;**

**DENIES summary judgment on Censor's breach of fiduciary duty claim as to ASC as it relates to the alleged copyright infringement;**

**GRANTS summary judgment for Defendants Shapiro and Ceconi as to Censor's breach of fiduciary duty claims;**

**DENIES summary judgment as to Censor's copyright infringement claim against ASC;**

GRANTS summary judgment for Defendants Shapiro and Ceconi to the extent that Censor alleges copyright infringement against them; and

GRANTS summary judgment for all Defendants as to Censor's fraud claim.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment directing an Accounting is GRANTED in part and DENIED in part. Specifically, the Court

GRANTS summary judgment as to Censor's right to a full accounting from the joint venture Benefits Essentials; and

DENIES summary judgment to the extent that Censor requests an accounting broader than this in scope.

For the foregoing reasons, Defendants' motion to amend is DENIED in its entirety.

IT IS SO ORDERED.
_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 28, 2012

81